**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| ARCADE JOSEPH COMEAUX, JR., | § | |
| (TDCJ-CID #841331) | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION H-03-2555 |
| | § | |
| DARRELL SUTTON, *et al.,* | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

In this suit, the plaintiff, Arcade Joseph Comeaux, Jr., a Texas prison inmate, made a number of allegations against prison officials. An appeal after summary judgment was granted affirmed the dismissal of all but the allegation that in February 2002, prison guards had used excessive force against Comeaux and other guards had failed to intervene. After remand and additional discovery on these claims, the defendants have again moved for summary judgment based on the expanded record and Comeaux filed many related motions. After a careful review of the motions filed by and responses, the summary judgment record, and the applicable law, this court grants the defendants' motion for summary judgment, disposes of Comeaux's motions as set out below, and enters final judgment by separate order. The reasons for these rulings are explained in detail in this memorandum and opinion.

## I.    Background

Comeaux has an extensive litigation history. Many of the causes of action he has asserted in different suits stem from his claim that he has extensive disabilities that made him wheelchair-dependent. In this case, he alleged that given his disabilities, the force used against him in February

2002, when he allegedly refused to comply with an order, was excessive.  But the record in this and other cases involving Comeaux shows that he has a history of physical violence and has attacked and injured others, including while in prison.  The record also shows that in 2002, the defendant correctional officers believed that Comeaux was exaggerating his disabilities, malingering, and was capable of physical violence.  The officers point to subsequent events as evidence that this belief was objectively reasonable.   In November 2009, Comeaux escaped from prison by shooting a semiautomatic pistol at two officers while he was secured in the back of a wheelchair transport van.  Comeaux forced the transport officers to give him their weapons and uniforms, handcuff themselves to each other, and lay face-down in the back of the van.  Comeaux escaped without his wheelchair.  He later arrested on the streets of Houston, where he had managed for approximately a week without a wheelchair.  The defendants point to these events as evidence that Comeaux was quite capable of the physical resistance the officers asserted he used in 2002 and as evidence that their belief that force was needed was reasonable.  These arguments, and the evidence, are analyzed below.

### A.    Comeaux's Claims in this Suit

Comeaux filed this suit in July 2003 against 23 prison administrators and employees at the Estelle Unit of the Texas Department of Criminal Justice – Correctional Institutions Division (TDCJ-CID).  Comeaux initially alleged that the defendants used excessive force against him, failed to protect his safety, verbally abused him, denied him medical care, denied him access to the courts, denied him due process, and deprived him of property, all in retaliation for exercising his right of access to the courts.[1]

---

[1]    Comeaux sued correctional officers Darrell Sutton, Mark Biscamp, Robert Jenkins, Jr., and Austin McComb; nurses Gail McCartney and Patti Revel; transporting officers John Doe I and John Doe II; law library officers Demetric Phipps, Robert Quada, and Lisa Harrison; the access to courts administrator, Frank Hoke; Captains Bradley Hutchison and Darrell Luker; inmate counsel substitute Sammy Wright; physician's

This court summarized Comeaux's allegations in an order entered on September 28, 2006:

> Comeaux is in the Estelle High Security Unit of the TDCJ-ID. He uses a wheelchair. On the morning of February 11, 2002, Comeaux was scheduled to go to the Fort Bend County Courthouse pursuant to a bench warrant. Comeaux alleges that [correctional officers] Biscamp, Jenkins, and Sutton were escorting him to the transport van when the incident that forms the basis of this suit occurred. Comeaux was handcuffed for the trip. In the elevator, Biscamp allegedly told Comeaux to stop filing suits and grievances. At the time, Biscamp was the defendant in a suit Comeaux had filed. Comeaux is apparently referring to Civil Action Number 4:01-CV-1411, in which Comeaux alleged that Biscamp discriminated against him based on his disability.
>
> Comeaux was taken to the second floor and placed in the middle of the hallway. Major McComb, Captain Hutchinson, and Nurse McCartney were present, along with five escorting officers. Comeaux was told that he would need to be strip-searched. Comeaux denies refusing an order for a strip-search, but agrees that he did not comply with an order to change from his administrative segregation clothing. Comeaux asserts that he had been strip-searched in the cell and that there was no need for a second strip-search. (Docket Entry No. 42, Comeaux Affidavit, Ex. Al, p. 38). Comeaux also claims that there was no policy requiring inmates to change clothes before transport to court and no policy that called for inmates to change in a hallway. The officers contend that there was a policy requiring inmates to change from their jail clothes before court appearances, which they were implementing. The officers contend that when they attempted to assist Comeaux in changing, he struggled and resisted, causing a struggle in which he fell to the floor and received two minor scrapes. Comeaux argues that as a disabled inmate, he is not required to wear a jumpsuit. Instead, he wears pants and a shirt.[2]

---

assistant Randall Healy; property room officer Jennifer Ragan; mailroom supervisor Martha Blackburn; assistant warden Timothy Simmons; senior warden and grievance coordinator Rick Thaler; retired grievance coordinator investigator Michael Velasquez; regional grievance step-2 disciplinary appeal coordinator Rollin Robinson; and the former TDCJ-CID director, Douglas Dretke.

[2]   The summary judgment evidence shows that Comeaux was wearing a T-shirt that he purchased, not a shirt issued by the prison. (Docket Entry No. 90, Defendants' Motion for Summary Judgment, Ex. E, Hutchison Deposition, p. 22; Docket Entry No. 100, First Supplement to Motion for Summary Judgment, Ex. A). Comeaux became agitated and began thrashing around in his wheelchair when Lieutenant Biscamp tried to cut off Comeaux's personal T-shirt. (Docket Entry No. 100, Defendants' Supplemental Motion for Summary

Comeaux alleges that using his refusal to comply with an order for a strip-search or to change his clothes as a pretext, Biscamp, who was standing behind his wheelchair, hit him on the head and neck for three to five minutes.  Comeaux claims that John Doe I, John Doe II, Major McComb, Captain Hutchinson, and Nurse McCartney stood by and did nothing to protect him.  Captain Hutchinson suggested getting a camera, but Major McComb refused.  McComb told the officers to get Comeaux's jail clothes off, saying that he did not care whether they were cut off or pulled off.  Biscamp asked the nurse for scissors to cut the jail clothes off Comeaux.  Comeaux alleges that when Biscamp had scissors in his hand, he began hitting Comeaux more violently.  Comeaux felt a pop in his neck, pain in his elbow and forearm, and a cut on his neck from the scissors.  He alleges that Jenkins and Sutton, who were standing by his wheelchair, lifted him out of the wheelchair and slammed him face-down to the concrete floor.  Comeaux's handcuffed hands were pinned beneath his body.  He alleges that the wind was knocked out of him and that he fractured his elbows.  Comeaux alleges that Sergeant Sutton beat him with his fists and pinned him with his knees, that Sutton put his knee on Comeaux's head, and that Jenkins dragged him, causing his face to scrape the floor.  Comeaux alleges that Sutton and Jenkins held him so other officers could beat him and Biscamp could hit him with the scissors.  According to Comeaux, Jenkins threatened more harm to Comeaux if he did not stop his litigation.

Comeaux's pants were cut off his body.  Captain McComb then ordered the removal of the handcuffs so the officers could change Comeaux's shirt.  Comeaux alleges that Biscamp applied the handcuffs in a way that cut off blood circulation and caused pain.

Comeaux alleged that he sustained the following injuries: knots on his head; friction burns on the right side of the face; a stab wound on left elbow; fractures to left and right elbows; swollen knees; abrasion on neck, shins, knee, and arms; swollen wrist; neck and back pain; and bruises on his chest.  Comeaux claimed that he only received band-aids and that Physician's Assistant Healy refused to examine his elbow after the incident, telling Comeaux that he would receive medical care when he stopped filing lawsuits.

---

Judgment, Ex. A, p. 171).

In June 2002, Comeaux complained that his elbow was fractured, that bone fragments had exited the wound, and that it had been swollen for months. Comeaux alleges that Physician's Assistant Healy refused to examine the elbow and told Comeaux that his elbow was fine. (Docket Entry No. 20, Plaintiff's More Definite Statement, p. 25). Comeaux states that in May 2004, he did receive an X-ray, but medical personnel will not tell him the result. (Docket Entry No. 20, Plaintiff's More Definite Statement, p. 13). Comeaux states that currently he has "floating" bones in his elbow and that a bone is missing from his elbow, causing swelling.

Comeaux alleges that after the February 11, 2004 incident, Sutton, Biscamp, Jenkins, McComb, McCartney, Luker, Velasquez, Wright, Ragan, Hutchinson, Blackburn, Quada, Phipps, Revel, and Healy conspired to retaliate against him for his legal activities. Comeaux claims that Sutton conspired with McComb and Hutchinson to write a false disciplinary report accusing Comeaux of refusing a strip-search.

Comeaux claims that after the February 11, 2002 incident, he was falsely accused of destroying a law book. Based on that accusation, defendants Phipps, Quada, Hoke, and Harrison placed him on legal restrictions for sixty days, allegedly to prevent him from taking legal action against the participants in the February 11, 2002 use of force.

Comeaux was assigned to administrative segregation long before the February 2002 incident. On February 13, 2002, the Administrative Segregation Committee ("ASC") put Comeaux on a Level 3 Property Restriction based on his refusal to "submit to a proper strip search which resulted in a MUOF (major use of force.)." This designation allowed "no additional personal property items . . . unless specifically authorized by unit/facility administration." Following a disciplinary charge, a hearing on February 18, 2002, and conviction, the ASC punished Comeaux with a restriction on legal property for seven days; placement in a cell without electricity; a five-day restriction on bedding, mattress, and linens; a three-day restriction on clothes, pants, shirt, and underwear; a seven-day food restriction; commissary, property, and recreation restrictions for seven months; a legal material purchasing restriction; and a drop in custodial status within administrative segregation from Level 2 to Level 3 for three months. Comeaux alleges that counsel substitute Wright, as well as Luker, Biscamp, and Sutton conspired to exclude him from the February 18, 2002 hearing, then falsely claimed that Comeaux refused to attend. Comeaux complains that inmates in administrative

segregation were generally denied due process in an ASC disciplinary hearing by not being allowed to attend, testify, or present evidence. Comeaux alleges that Dretke allowed these due process violations to occur.

Comeaux alleges that the efforts to have him stop his litigation activity continued. He alleges that in May 2002, Sutton and Jenkins came to his cell and asked if he would drop his lawsuit. On June 5, 2002, according to Comeaux, Luker disregarded evidence of his innocence and found him guilty of a false charge of threatening an officer in disciplinary case 20020250567. Comeaux alleges that Officer Ragan threatened to throw away Comeaux's legal property if he did not drop a lawsuit naming Ragan. Comeaux alleges that M. Velasquez interfered with the processing of Comeaux's grievances stemming from the February 2002 use of force incident. When asked about the delay, Velasquez allegedly said, "We take care of each other." Comeaux alleges that Lieutenant J. Ragan withheld Comeaux's legal property, stating that Jenkins and Hutchinson were friends of hers and that she would return the property if Comeaux would drop his lawsuit against them. Comeaux alleges that Martha Blackburn opened his legal mail and withheld or discarded it as a form of retaliation to try to force Comeaux to drop his case against her. Comeaux alleges that as a result of these actions, he was forced to seek multiple court extensions and that some of his cases were dismissed for late filing. Comeaux also alleges that Rick Thaler and Rollin Robinson failed to investigate Comeaux's grievances, denying his right to due process.

Comeaux alleges that in July 2002, he was left on the floor for two or three days with protruding hemorrhoids, external bleeding, septic cysts, and swelling on his left side. He alleges that Physician's Assistant Healy refused to treat him unless he crawled to his wheelchair and did not allow other officers to lift Comeaux off the floor and into his wheelchair. Comeaux alleges that he had to commit self-mutilation to get medical care. He alleges that nurse Revel looked at the self-inflicted injury, squeezed alcohol into the wound to provoke pain, said that Comeaux had not bled enough, and left without treating the wound. Other officers helped to stop the bleeding. Revel sent Comeaux to the Jester IV Unit, saying that Comeaux would get better medical treatment if he stopped filing lawsuits.

Comeaux was transferred to the Jester IV Unit, where he received treatment and medications. He alleges that when he returned to the

6

Estelle Unit, he was again denied medical care.  He alleges that Healy stopped changing the wound dressing and told Comeaux that if he wanted adequate medical care, he had to stop filing lawsuits. Comeaux alleges that he was forced to drop one of his lawsuits, Case No. 02-4144, which alleged the use of excessive force, failure to protect, denial of due process, discrimination, denial of access to the courts, retaliation, and denial of basic human needs.

Comeaux seeks $5,000 from each defendant and $500,000 in punitive damages.  He asks that the disciplinary cases be expunged from his record.  Comeaux seeks a declaratory judgment that Estelle Unit and the ASC are arbitrarily punishing offenders without due process.

(Docket Entry No. 52, pp. 2-9).

On September 28, 2006, this court granted the defendants' motion for summary judgment. (Docket Entry No. 52).  On March 28, 2008, the United States Court of Appeals for the Fifth Circuit affirmed this court's judgment in part and remanded Comeaux's excessive force and failure-to-protect claims.  (Docket Entry No. 66).  After the remand, this court appointed counsel to represent Comeaux.  Additional discovery led to the filing of the pending motions.  Those motions include the following:

- Sutton, Biscamp, Jenkins, Hutchison, McComb and Simmons, TDCJ correctional officers, and McCartney, a nurse, moved for summary judgment on Comeaux's claims that Sutton, Biscamp, and Jenkins beat him on February 11, 2002 and that Hutchison, McComb, Simmons, and McCartney watched without intervening.[3]  (Docket Entry No. 90).  Comeaux has responded, (Docket Entry No. 94).

- Sutton, Biscamp, Jenkins, Hutchison, McComb, Simmons, and McCartney filed a supplemental motion for summary judgment.  (Docket Entry No. 100).  Comeaux filed a

---

[3]   On April 5, 2010, the court approved the parties' stipulation dismissing Comeaux's claims against McCartney, with prejudice.  (Docket Entry No. 123).

motion to strike the supplement, (Docket Entry No. 104), which the defendants opposed, (Docket Entry No. 115).

- Sutton, Biscamp, Jenkins, Hutchison, McComb, Simmons, and McCartney filed a second supplemental motion for summary judgment. (Docket Entry No. 106). Comeaux moved to strike this supplement, (Docket Entry No. 109), which the defendants opposed. (Docket Entry No. 115).

- Sutton, Biscamp, Jenkins, Hutchison, McComb, and Simmons filed a third supplemental motion for summary judgment. (Docket Entry No. 133). Comeaux moved to strike the supplement, (Docket Entry No. 137), which the defendants opposed. (Docket Entry No. 140). Comeaux filed a supplemental response to the defendants' motions for summary judgment. (Docket Entry No. 147). The defendants filed a reply. (Docket Entry No. 148).

- Sutton, Biscamp, Jenkins, Hutchison, McComb, and Simmons filed a fourth supplemental motion for summary judgment. (Docket Entry No. 150).

This court held a hearing in which counsel presented oral arguments on the summary judgment motions. (Docket Entry Nos. 124, 126).

### B.    Comeaux's Litigation History

Comeaux has an extensive litigation history in federal court. In Civil Action Number 4:01-1411, a conditions-of-confinement suit Comeaux filed in 2001, the federal court summarized that history, as follows:

> Court records show that Comeaux was convicted initially on April 23, 1984, following his guilty plea to charges of indecency with a child, for which he received a sentence of twenty years' imprisonment. *See Comeaux v. Cockrell*, Civil Action No. H-01-1670 (S.D. Tex.) (Docket Entry No. 16). After Comeaux was released on mandatory supervision, he was convicted again on June

8

3, 1997, of committing aggravated sexual assault of a child, for which he received a life sentence. *See Comeaux v. Cockrell*, Civil Action No. H-01-3405 (S.D. Tex.); *see also Comeaux v. State*, No.01-99-00147-CR, 1999 WL 977832 (Tex. App. — Houston [1st Dist.] Oct. 28, 1999). Comeaux remains in custody of TDCJ at the Estelle High Security Unit in Huntsville, Texas.

 . . . A thorough discussion of Comeaux's claims requires an overview of his custodial history as it relates to his conditions of confinement.

After Comeaux was convicted and sentenced to life imprisonment in 1997, he was initially assigned to TDCJ's Telford Unit. At that time, Comeaux alleges that an assortment of medical problems left him confined to a wheelchair. Comeaux claims to suffer from "hemi-plegia" as the result of a stroke. Comeaux claims that he is paralyzed on his left side and that he has weakness on his right side, which make it impossible for him to ambulate. In addition, he claims to suffer from a variety of ailments, including high blood pressure, asthma, "heart problems," muscle spasms, and thyroid disease. Comeaux claims that he is "double incontinent" and that he must wear diapers and a catheter. Comeaux alleges further that he needs assistance to brush his teeth, pick up a food tray, dress, shower, transfer from his wheelchair to his bed, the shower chair, or the toilet, or to shave, to make up his bed, and to clean his cell area.

As a result of his medical condition, Comeaux was reportedly transferred from the Telford Unit to the Jester III Unit. Comeaux describes the Jester III Unit as a "barrier-free" facility with a "secondary medical care unit" that is fully capable of accommodating his special needs. The Jester III Unit features the Physically Handicapped Offenders Program ("PHOP"), where Comeaux was enrolled to receive treatment. On July 11, 1999, however, Comeaux reports that he was "involve[d] in an assault incident" that resulted in his transfer to the Estelle High Security Unit.

The "assault incident" that Comeaux glosses over in his complaint was, in fact, a vicious attack perpetrated by Comeaux. Specifically, Comeaux assaulted his former wife in the Jester III Unit visitation room by stabbing her with a twelve-inch rod fashioned from the handle of a mop bucket. *See Comeaux v. Cockrell*, Civil Action No. H-01-1670 (S.D. Tex.) (Docket Entry No. 16). During that same incident, Comeaux also stabbed the father of another prisoner who attempted to come to the wife's aid. (*See id*.). Comeaux was

9

convicted of two counts of aggravated assault with a deadly weapon stemming from this incident, pursuant to his guilty plea, and he received two additional life sentences as a result. *See Comeaux v. State*, Nos. 01-03-00377-CR, 01-03-00378-CR, 2004 WL 1472074 (Tex. App. — Houston [1st Dist.] July 1, 2004, pet. ref'd).

Comeaux's violent outburst terminated his participation in the PHOP and ended his stay at the Jester III facility.  On August 23, 1999, Comeaux was transferred to the Estelle High Security Unit. Following his transfer to the Estelle High Security Unit, Comeaux was assigned to administrative segregation because of his assaultive behavior.  According to Assistant Warden Tom Hunt, who works for TDCJ at the Estelle High Security Unit, administrative segregation is the most restrictive classification that a TDCJ inmate can have and is reserved for those inmates who are either deemed a serious risk to the safety of officers and other inmates or who are confirmed affiliates of a designated Security Threat Group or gang.  (Docket Entry No. 89, Exhibit B).  Inmates who are assigned to administrative segregation are confined to their cells for 23 hours each day.  (*See id.*).  These inmates get one hour of recreation outside each day and must be restrained and escorted by security personnel any time they are moved from their cell.  (*See id.*).

In September of 1999, Comeaux returned to the Jester III Unit for additional therapy.  After completing his therapy in May of 2000, Comeaux was discharged from the PHOP and returned to administrative segregation in the Estelle High Security Unit.  Soon after he was returned to the Estelle High Security Unit, Comeaux filed a civil rights lawsuit against PHOP Director Dr. Kokila Niak and others at the Jester III Unit.  *See Comeaux v. Mackwani*, *et al.*, Civil Action No. H-00-3812 (S.D. Tex.).  In that lawsuit, Comeaux complained primarily that Dr. Niak wrongfully discharged him from the PHOP therapy program and that his subsequent transfer from Jester III to the Estelle High Security Unit resulted in a denial of adequate medical care. . . .

Shortly after his case against the Jester III defendants was set for a *Spears* hearing, Comeaux filed the pending lawsuit against Warden Thaler and others at the Estelle High Security Unit, complaining that he was being denied proper medical care and that his accommodations were inadequate.  *See Comeaux v. Thaler, et al.*, Civil Action No. H-01-1411 (S.D. Tex.).  The original complaint also named several TDCJ officials employed at the Jester III Unit. (Docket Entry No. 1).  Because of the closely related nature of the

claims, the cases were consolidated for purposes of the *Spears* hearing, which was held on May 18, 2001.  After the *Spears* hearing, the presiding district court dismissed all of Comeaux's claims in the consolidated cases except for those lodged against Dr. Niak.  *See Comeaux v. Mackwani, et al.*, Civil Action No. H-00-3812 (S.D. Tex.) (Docket Entry No. 27).  Dr. Niak prevailed after demonstrating that Comeaux was not denied care and that, moreover, medical records and accounts from Estelle Unit personnel showed that Comeaux, who was observed standing and caring for himself on his own, was malingering.  *See* Civil Action No. H-00-3812 (Docket Entry No. 70).

The Fifth Circuit affirmed the decision in favor of Dr. Niak and the other Jester III Unit defendants.  *See Comeaux v. Mackwani, et al.,* No. 03-20776 (5th Cir. March 23, 2005).  However, the Fifth Circuit remanded a portion of the consolidated case filed by Comeaux in Civil Action No. H-01-1411 for further consideration of whether Warden Rick Thaler and others at that facility had personal knowledge that the Estelle High Security Unit was not equipped to meet Comeaux's special needs as a handicapped offender and whether the failure to meet these special needs would result in the denial of Comeaux's "basic necessities of life." *Id.*  After the case was remanded, Comeaux filed an amended complaint to clarify his remaining claims.  (Docket Entry No. 20).

*Comeaux v. Thaler,* Civil Action Number 4:01-1411, 2008 WL 818341 (S.D. Tex. 2008) (footnotes omitted).  This conditions-of-confinement case ended when the court granted the defendants' motions for summary judgment.  The court found that Comeaux's alleged disability was no more than a ruse and that he made no showing that prison officials at the Estelle Unit had discriminated against him because of any disability.

The only issue in the present case is Comeaux's claim that in February 2002, prison guards used excessive force against him and that other guards in the vicinity failed to intervene.  The summary judgment evidence is examined in detail below under the applicable legal standards.

## II.    The Summary Judgment Standard

11

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986)).  If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *See Celotex*, 477 U.S. at 325.  While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted).  "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted).  "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings.  The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007).  "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d

at 1075).  In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party.  *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

**III.**     **The Summary Judgment Evidence**

The defendants' summary judgment exhibits include the following:

(A)     media reports of Comeaux's 2009 escape;

(B)     a TDCJ commitment inquiry;

(C)     the court's opinion in *Comeaux v. Thaler, et al.,* Civil Action Number 4:01-1411;

(D)     an affidavit by Dr. Kokila Naik submitted in *Comeaux v. Thaler, et al.,* Civil Action Number 4:01-1411;

(E)     excerpts from the depositions of Arcade Comeaux, Darrell Sutton, Robert Jenkins, Jr., Mark Biscamp, Bradley K. Hutchison, Austin B. McComb, Jr., Gail McCartney and Timothy Simmons; and

(F)     portions of the TDCJ Use of Force Plan.

With their first supplemental motion for summary judgment, (Docket Entry No. 100), the defendants included the following exhibits:

(A)     a TDCJ Use of Force Report dated February 11, 2002;

(B)     a TDCJ Use of Force Video dated February 11, 2002;

(C)     a TDCJ Serious Incident Report dated December 9, 2009; and

(D)     a videotape recording of Comeaux returning to TDCJ after his escape, dated December 17, 2009.

(Docket Entry No. 100).

13

With their second supplemental motion for summary judgment, (Docket Entry No. 106), the defendants included a copy of the evidence submitted to the district court in *Comeaux v. Mackwani, et al.*, Civil Action Number H-00-3812 (S.D. Tex.).

With their third supplemental motion for summary judgment, (Docket Entry No. 133), the defendants included the affidavit of Dr. Naik dated May 21, 2010, and a complete copy of Comeaux's deposition.  (Docket Entry No. 150).

In response to the defendants' motion for summary judgment, Comeaux submitted the following exhibits:

    (A)    excerpts of Comeaux's October 7, 2009 deposition;

    (B)    excerpts of Darrell Sutton's September 30, 2009 deposition;

    (C)    excerpts of Austin McComb's September 28, 2009 deposition;

    (D)    excerpts of Gail McCartney's September 29, 2009 deposition;

    (E)    a copy of the defendants' June 6, 2007 letter brief to the United States Court of Appeals for the Fifth Circuit, Case Number 06-20869;

    (F)    a copy of Comeaux's original complaint in Civil Action Number 4:01-cv-1411, in the United States District Court for the Southern District of Texas, Houston Division, filed on April 27, 2001; and

    (G)    a copy of the Major Use of Force document produced by the defendants.

(Docket Entry No. 95).

Comeaux included the following exhibits with his Supplemental Brief in Opposition to Defendants' Motion for Summary Judgment, (Docket Entry No. 147):

    (A)    transcript of the April 1, 2010 hearing;

(B)     John Patrick's June 9, 2010 deposition;

(C)     the TDCJ February 20, 2002 Major Use of Force Report, Administrative Review;

(D)     TDCJ's Records Retention Schedule; and

(E)     TDCJ's Records Management Plan.

Comeaux's affidavit and deposition, and TDCJ's use-of-force reports and use-of-force videotape are summarized below.

**A.      Comeaux's Affidavit**

In his affidavit, Comeaux described how defendants Sutton, Biscamp, and Jenkins allegedly beat him on February 11, 2002 and how defendants Hutchison, McComb, and Simmons watched without intervening. Comeaux claimed that Sergeant Sutton, Lieutenant Biscamp, Sergeant Jenkins, and officers John Doe 1 and 2 came to his cell between 7:30 and 8:30 a.m. to escort him to the transport van for a court appearance.  (Docket Entry No. 42, Comeaux Affidavit, Ex. A1, p. 22). They performed a strip search and placed him in hand restraints.  Comeaux denied resisting.  The hand restraints were in the front because of the wheelchair.  Comeaux was taken to the second floor medical area instead of the transport van.  In the elevator, Biscamp stated, in what Comeaux alleged was a threatening manner, that it would be in Comeaux's interests to stop filing lawsuits and grievances against prison officials.

When they reached the second floor and Comeaux was in his wheelchair in the middle of the hallway, Nurse McCartney and Major McComb asked if he would accept a shower.  He responded, "I sure wish my judge and attorney could see my condition and treatment."  Comeaux stated that Sergeant Biscamp, who was standing behind Comeaux's wheelchair, began assaulting Comeaux as

15

soon as he uttered these words.  (*Id*. at 25).  Comeaux alleged that Biscamp used his forearm and elbows to beat him on the head, neck, and shoulders and that neither Captain Hutchison nor Major McComb intervened.  Hutchison asked McComb whether he should get a video camera.

Comeaux denied refusing to undress as ordered to change his clothes before being taken to the court for a hearing on the criminal case against him arising out of his assault on his wife.  He asserts that he could not take his clothes off because his handcuffs were fastened in front of his body.  Biscamp would not remove the handcuffs.  After Comeaux took his shirt off as much as he could, Biscamp ordered him to put the shirt back on.  (*Id*. at 26).  Comeaux complied.  Biscamp then said "I am going to cut the ——-- f----- off."  Biscamp asked for scissors to cut off the shirt and told Comeaux that he would "stab his ass" if he moved.  (*Id*. at 26).

The summary judgment evidence shows that the officers did not simply remove the handcuffs to make it easy for Comeaux to undress because of the safety hazard involved.  Instead, the procedures available included separately releasing one hand from the restraints to remove the shirt, replacing that handcuff, and releasing the other handcuff.  The defendants present summary judgment evidence that when Comeaux refused to cooperate, Biscamp called for scissors to cut the shirt off.  The summary judgment evidence shows that Comeaux was wearing a T-shirt that he had purchased, not a prison-issued shirt, and that he became agitated when Biscamp began to cut it off.  (Docket Entry No. 90, Defendants' Motion for Summary Judgment, Ex. E, Hutchison Deposition, p. 22; Docket Entry No. 100, First Supplement to Motion for Summary Judgment, Ex. A, p. 171).  The summary judgment evidence also shows that the scissors Biscamp was using were medical scissors obtained from the nursing station.  Those scissors have rounded tips and cannot be used to stab.

Comeaux stated that once the first assault by Biscamp ceased, Major McComb and Nurse McCartney again offered Comeaux a shower.  (Docket Entry No. 42, Comeaux Affidavit, Ex. A1, pp. 25, 29).  Comeaux accepted at first.  (*Id*. at 26).  Comeaux made a second comment, "they never tried to help me before but since I was going to court they was [sic] trying to coverup my condition and treatment and that I wish that judge and lawyer could see me."  Major McComb told Comeaux that his lawsuits and grievances would not help him.  (*Id*. at 29-30).  At that point, Major McComb ordered Biscamp to hurry up and remove Comeaux's dirty clothes, either taking them or cutting them off, because the transport officers needed to go.  (*Id*. at 30).  Biscamp then allegedly assaulted Comeaux with blows to the head, neck, and shoulder, using his forearms, elbow, and scissors.  (*Id*. at 29).  Comeaux moved forward in his wheelchair to lessen the impact of the blows and stabs to his neck.  He stated that no officers could have felt threatened by him because Biscamp was behind the wheelchair and Sutton and Jenkins were by the side.  (*Id*. at 30).

Comeaux stated that Jenkins tried unsuccessfully to "body slam" him into the wall.  When this failed, Jenkins became irate and asked Sutton for help.  Comeaux alleged that Jenkins and Sutton lifted him five feet into the air and slammed him to the concrete floor.  Jenkins and Sutton then pinned Comeaux to the floor with their full body weight, beat his head and body with closed fists, and kneed him in the ribs.  (*Id*. at 32, 33).  Comeaux stated that he "half slid" and was "half slammed" onto the floor and that the steel handcuffs caused deep cuts and bruising because the officers allegedly pulled Comeaux's arms in different directions, causing the steel handcuffs to cut his wrists.  The side of his face scraped the floor, resulting in a friction burn.  Comeaux alleged that Biscamp stabbed him in the left elbow, causing "vibration of bone contact," lacerations, severe

17

bleeding for one month, and permanent scarring.  (*Id*. at 33).  Comeaux stated that Nurse McCartney performed only a cursory examination.

### B.        Comeaux's Deposition Testimony

Comeaux testified in his deposition that on February 11, 2002, he was scheduled to go to the Fort Bend County Courthouse on a bench warrant.  At about 8:00 or 8:15 a.m., Biscamp knocked on Comeaux's door and told him to get ready for court.  (Docket Entry No. 95, Plaintiff's Response, Ex. A, Comeaux Deposition, p. 46).  Comeaux left his cell, the officers pat-searched him, and Sutton pushed the wheelchair to the elevator.  Instead of being taken to the transport van, however, Comeaux was taken to the second floor medical area by Biscamp, Jenkins, and Sutton.  (*Id*.).  In the elevator, according to Comeaux's deposition testimony, Biscamp told him that it would be "best that [Comeaux] stop filing grievances and lawsuits on him and his officers."  (*Id*. at 47).

Comeaux was offered assistance with a shower, which he initially accepted.  He then changed his mind, telling the defendants that "he would like [the] judge and attorney to see how y'all been treating me because I hadn't had a shower in eight months."  (Ex. A, Comeaux Dep. at 47:19-21). Right after that statement, Biscamp allegedly began to strike him from behind about the head and shoulders with his forearm and elbow.  (*Id*. at 47).  After that attack ended, Hutchison turned to McComb — the highest ranking officer present — and asked if a video camera and operator were necessary, to which McComb answered "no."  (*Id*. at 48).

Comeaux testified:

> [Major McComb] and Ms. McCartney again came up to my chair and asked me, "Can you take your clothes off?"  I say, well, I say, yeah. So I grabbed my shirt like this here, "Pull it off."  I say, "This is as far  as I can go," because I had hand restraints on and the hand restraints wouldn't let it go any further.  And Biscamp told Ms. McCartney, "Give me a pair of scissors, I'll cut the MF off."  And

18

> I'm looking around trying to, you know, see what's going on, so he said, "Put your shirt back on," so I slid it back over my — my head. And so I said, "This just ain't right, man."  I said, "I'm sure going to let my lawyer and my judge know this."

(*Id*. at 48).

Comeaux testified that right after he made this comment, Biscamp began hitting him with a pair of scissors.  (*Id*. at 48-49).  Comeaux continued:

> They picked me up out of my wheelchair chest high, Sergeant Sutton turned — I mean, Sergeant Jenkins turned me upside down.  He was trying to hit my head into the ground, but Sergeant Sutton lost balance.  When he lost balance, rather than them slamming me head first, I — they slid me like you're sliding to first base with them on top of me, then they started hitting me with their closed fists.  After they started hitting me and they started kneeing me, Biscamp — well, now, before Biscamp did it, after they did that, Sergeant Sutton had his knee on the side of my face with his weight on it and him and Jenkins was pulling on my arm both elbows opposite and I yelled, and when I started hollering because it was hurting, they was pulling me,  and when they were pulling me, my face was on the ground, it was scraping against the ground like that, and Biscamp jumped on my back with his knee.  When they jumped on back with my knee, I felt my arm jerk, my left arm jerk.  When I felt the jerk, I seen the scissors in my arm and he pulled it out.  When he pulled it out — let me see.  When he pulled it out — . . . When he pulled the scissors out, the camera lady stood in front of me.  Lieutenant — the camera was on.  Lieutenant Biscamp jumped up off me and ran to the camera and he said that Comeaux failed to submit for a proper strip search and a Use of Force occurred, and I was yelling that it was a lie, because they had brought me up there about a shower as far as what they told me from the beginning and a strip search was never even mentioned.  And after he said that, he came, he cut off all my clothes, and may — no, Captain Hutchinson was talking to the camera lady and she moved to the backside of me, and by that time, Lieutenant Biscamp had cut my shirt off but the scissors had got dull, because it wasn't normal hospital scissors.  It was some pink scissors.  And when it got dull halfway, Major McComb said, "Oh, just take the handcuffs off of him and take the — pull his shirt off."  So they undid the handcuffs, and pulled my shirt off . . .

(*Id*. at 49-51).

19

### C.     The Use of Force Reports

In his February 11, 2002 Employee Participant Statement, Lieutenant Biscamp stated that Comeaux began complying with orders to remove his shirt but could not get it off all the way with the handcuffs.  Biscamp began to cut Comeaux's shirt with medical scissors.[4]  Comeaux became agitated and "jerked away and began pulling away from staff flailing out with his elbows." (Docket Entry No. 100, Defendants' Supplemental Motion for Summary Judgment, Ex. A, p. 161).  Jenkins placed Comeaux on the floor, and Biscamp used medical scissors to remove Comeaux's clothing. Officer Monjaras arrived with the video camera after Comeaux's clothing had been removed. (*Id*.). Biscamp, Jenkins and Sutton then dressed Comeaux in clean clothing.  Comeaux was returned to his wheelchair, examined by Nurse McCartney, and escorted to a van. (*Id*. at 161-62).

In his February 11, 2002 Employee Participant Statement, Sergeant Jenkins stated that Comeaux was told that he would be transported to court.  Officers explained to Comeaux that before he could be transported, he would have to submit to a strip search and change his clothes. (Docket Entry No. 100, Defendants' Supplemental Motion for Summary Judgment, Ex. A, p. 164). Jenkins stated that Comeaux resisted by not allowing staff to remove his clothes.  Comeaux instead began to turn and jerk aggressively. (*Id*.).  Jenkins placed his hands on Comeaux's chest and put him on the floor. Jenkins and Sutton removed Comeaux's pants and socks while Biscamp removed his shirt. Jenkins took photographs of Comeaux's injuries after Nurse McCartney examined him.

---

[4]  Nurse McCartney testified that medical or trauma scissors have a blunt end and are designed not to cut the skin. (Docket Entry No. 90, Defendants' Motion for Summary Judgment, Ex. E, McCartney Deposition, pp. 41-42).

In his Employee Participant Statement, also dated February 11, 2002, Sergeant Sutton stated that he placed Comeaux in hand restraints and escorted him to the second floor medical hallway. TDCJ policy required Comeaux to submit to a strip search and change of clothes before being transported to court.  Comeaux began resisting.  Sutton grabbed Comeaux's right arm and guided him to the floor.  Sutton removed the hand restraints from Comeaux's wrists, one hand at a time, placed Comeaux in a clean shirt, and reapplied the hand restraints.  (*Id.* at 167).

In his Employee Participant Statement of the same date, Major McComb stated that he was present in the second floor medical area when officers were preparing Comeaux for transport to state court.  Comeaux refused to cooperate as officers tried to exchange his soiled clothing for clean clothing.  Biscamp was attempting to use medical scissors to remove Comeaux's dirty clothing. Comeaux was part of the Physically Handicapped Offender Program and claimed to have only limited movement.  McComb described what he saw:

> . . . Comeaux became agitated and began thrashing in the wheel chair attempting to prevent Lt. Biscamp from removing the clothing.  Sgt. Jenkins and Sgt. Sutton restrained Offender Comeaux's thrashing and placed him on the ground from the wheelchair.  Officer Monjaras arrived with a  video camera and began taping the use of force.  Lt. Biscamp cut off Offender Comeaux's clothing and with the assistance of Sgt. Sutton and Sgt. Jenkins searched and redressed Offender Comeaux.  Sgt. Sutton removed the hand restraints to allow the shirt to be put on.  Sgt. Sutton also placed leg restraints and a belly chain on Offender Comeaux to prepare for transport.

(*Id.* at 171).

Comeaux refused to complete the Offender Participant Statement.  (Docket Entry No. 100, Defendants' Supplemental Motion for Summary Judgment, Ex. A, p. 169).

Nurse McCartney completed a use-of-force witness statement on February 11, 2002, in which she stated that she heard a commotion in the second floor hallway at 9:50 a.m. (Docket Entry

No. 100, Defendants' Supplemental Motion for Summary Judgment, Ex. A, p. 147). She saw security officers securing Comeaux on the floor. She performed an examination to determine the extent of Comeaux's injuries. She noted a 4 inch by 1/4 inch abrasion below the right knee, which she described as a superficial wound. She also noted a 1/4 inch round superficial abrasion on the left elbow. She cleaned the areas and applied triple antibiotic ointment and bandaids.

Nurse McCartney also completed an Offender Use of Force Injury Report on February 11, 2002. (*Id.* at 148). She noted that Comeaux complained of an abrasion on the right leg below the knee and an abrasion on the left elbow. No other injuries were noted.

### D.    Summary of the Use-of-Force Videotape

This court has reviewed the videotape recording of the events after the use-of-force on February 11, 2002. (Docket Entry No. 100, First Supplement to Motion for Summary Judgment, Ex. A). The following summarizes the recording:

| | | |
|---|---|---|
| (1) | (10:05:10) | Two officers put underwear on Comeaux while he was on the floor naked. A third officer held his arm. |
| (2) | (10:05:15) | Comeaux stated that he was thrown out of his wheelchair because he wanted to keep his personal shirt. |
| (3) | (10:05:36) | Two officers put pants on Comeaux. |
| (4) | (10:05-57) | Comeaux stated that he was not aggressive, did not swing or raise his voice and the officers threw him on the floor for no reason. |
| (5) | (10:06:15) | Three officers put on Comeaux's shirt. |
| (6) | (10:06:20) | The officers released Comeaux's right hand from the handcuffs and put on the right sleeve of the shirt. |
| (7) | (10:06:44) | The officers placed Comeaux's right hand in a second pair of handcuffs. |
| (8) | (10:06:47) | Comeaux stated that he was bleeding in two places. |

(9)     (10:06:56)    Comeaux still had the handcuff from the first set on the left hand. Officers removed the handcuffs from the left hand while they put on the shirt.

(10)    (10:07:11)    The officers put Comeaux's left hand into the second pair of handcuffs.

(11)    (10:07:34)    The officers placed leg restraints on Comeaux.

(12)    (10:08:02)    The officers used a chain to connect the leg restraints to the hand restraints.

(13)    (10:08:12)    Comeaux was lying on his stomach.

(14)    (10:08:33)    Two officers held Comeaux's right arm down.  The officers did not appear to be exerting force.

(15)    (10:08:58)    Two officers pulled Comeaux up by his clothes and placed him in the wheelchair.

(16)    (10:09:40)    The nurse examined Comeaux's right leg.

(17)    (10:09:27)    One officer held Comeaux's left arm while the other officer held the back of his shirt.

(18)    (10:10:30)    An officer took photographs of Comeaux's leg.

(19)    (10:10:34)    The nurse applied medication to Comeaux's knee.

(20)    (10:10:52)    An officer took photographs of Comeaux's left elbow.

(21)    (10:11:10)    Comeaux complained that the officers intentionally pushed him to the floor, choked him, and pressed weight on his head.

(22)    (10:11:41)    The nurse placed a bandage on Comeaux's right knee.

(23)    (10:12:18)    Comeaux complained that his personal shirt was cut off.

(24)    (10:12:19)    The nurse applied another bandage to the right knee.

(25)    (10:12:30)    Comeaux stated, in response to the nurse's questions, that he could not feel anything on the left side of his body and that she must examine it herself.

(26)     (10:12:30)     The nurse examined Comeaux's left elbow.

(27)     (10:12:50)     The nurse put a gauze pad on the elbow.

(28)     (10:13:28)     An officer stated that Comeaux started resisting when they began removing his clothing and at that point, Comeaux was placed on the floor.

(29)     (10:15:11)     The nurse applied a bandage to the left elbow.

(30)     (10:15:04)     Comeaux stated that he had been trying to get a change of clothes for eight months and that the officers did not want his lawyer and judge to see his condition.  Comeaux complained that he had no sensation on the left side.

(31)     (10:15:27 -
         10:16:11)     The nurse began examining Comeaux's left side.  She looked under his shirt at his chest, looked under the front of his pants, looked at the left leg under the pants, pulled up the left sleeve, and looked under the shirt on his back.

(32)     (10:16:14)     Officers began escorting Comeaux down the hall.

(33)     (10:16:44)     Officers pushed Comeaux's wheelchair into the elevator.

(34)     (10:18:04)     Officers pushed Comeaux's wheelchair outside the building.  As the officers pushed the wheelchair, Comeaux continued to talk to the camera.

(35)     (10:19:12)     Officers loaded Comeaux onto the wheelchair lift of the transport van.

(36)     (10:19:53 -
         10:21:44)     The officers secured Comeaux's wheelchair in the van.

(37)     (10:21:55)     The officers put socks on Comeaux's feet.

(38)     (10:22:36)     The officers folded the lift and closed the doors to the van.

(39)     (10:22:55)     An officer noted that Comeaux had been secured in the van.

(40)     (10:23:02)     The officer terminated the use-of-force recording.

E.      Summary of Arguments

In their motion for summary judgment, the defendants argue that they provided evidence showing that a minimal amount of force was used to regain control over Comeaux when he resisted an order to remove his clothes and began jerking and swinging his arms. The defendants argue that they have shown that they reasonably believed Comeaux posed a threat because he was faking his disability and because his heavy hand restraints could cause injury as he swung his arms. The defendants point to Comeaux's later escape, in which he commandeered a wheelchair transport van at gunpoint and remained at large without a wheelchair for nearly one week. They argue that Comeaux's escape shows that their beliefs in his physical capabilities were reasonable. Finally, the defendants contend that the physical injuries documented on the day in question simply do not support Comeaux's assertion that he was beaten. Rather, Comeaux's injuries are consistent only with the use of minimal force to restore order.

Comeaux argues that even assuming that he was not truthful about the full extent of his disability when he attempted to escape, that is irrelevant to his physical condition in 2002. He argues that his physical condition in 2009 does not prove or disprove his physical condition seven years earlier. As a result, according to Comeaux, the arguments and evidence about his 2009 escape are irrelevant to the summary judgment motion, do not show the absence of a material fact about the 2002 major use of force incident, and, if accepted, would be an improper inference drawn against the nonmovant. Comeaux argues that in remanding his excessive force and failure to protect claims, the Fifth Circuit held that a genuine issue of material fact exists. Comeaux argues that the underlying facts about the major use of force incident are disputed and should not be determined on summary judgment.

In his Supplemental Brief in Opposition to Defendants' Motion for Summary Judgment, Comeaux argues that the defendants have not produced the original videotape of the 2002 incident. (Docket Entry No. 147).  At his deposition, John Patrick, TDCJ's administrative monitor for use of force incidents and the custodian of records for all use-of-force reports and accompanying videos, testified that the original video of the 2002 incident was 18 minutes and 10 seconds, (*id*. at 4) (citing Ex. B, Patrick Dep., at 64:12-16), while the archive copy and the produced video was 8 seconds shorter.  The defendants respond that this does not create a genuine issue of material fact justifying a denial of defendants' motion for summary judgment.  First, Comeaux cannot show that the individual defendants had any control over the video after it left the unit in 2002.  (Docket Entry No. 148).  In addition, the defendants dispute the assertion that 8 seconds are missing from the archive and the produced copy of the video.

The defendants assert that as a matter of law, they are entitled to qualified immunity because Comeaux failed to allege a constitutional violation and because the undisputed evidence shows that their actions were objectively reasonable in light of clearly established law.  (Docket Entry No. 90, Defendants' Motion for Summary Judgment, p. 15).  This court analyzes the defendants' motion for summary judgment based on qualified immunity in light of the summary judgment evidence and the applicable law.

## IV.    The Qualified Immunity Analysis

### A.    The Legal Standard

A government official performing discretionary functions is entitled to qualified immunity unless his conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known.  *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).  Qualified immunity

shields government officials from liability when they are acting within their discretionary authority and their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Flores v. City of Palacios,* 381 F.3d 391, 393-94 (5th Cir. 2004). "[T]he qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Mangieri v. Clifton,* 29 F.3d 1012, 1017 (5th Cir. 1994) (quoting *Hunter v. Bryant,* 502 U.S. 224, 227 (1991)).

There are two steps in the qualified immunity analysis: whether the plaintiff has alleged the violation of a statutory or constitutional right; and whether the defendant's actions violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *See Flores v. City of Palacios,* 381 F.3d 391, 395 (5th Cir. 2004). A court applies "current law to the first step and the law at the time of the incident to the second step, which may sometimes result in applying different tests to the two steps." *Id.* at 395 n.3.

Once a government employee pleads the affirmative defense of qualified immunity, the burden shifts to the plaintiff to rebut the defense by establishing that the government employee's allegedly wrongful conduct violated clearly established law. *Bazan v. Hidalgo Cnty.,* 246 F.3d 481, 489 (5th Cir. 2001). This requires the plaintiff to plead "claims of specific conduct and actions giving rise to a constitutional violation." *Baker v. Putnal,* 75 F.3d 190, 195 (5th Cir. 1996).

In reviewing a motion for summary judgment based on qualified immunity, a district court considers whether a federal statutory or constitutional right would have been violated on the facts alleged. *Saucier v. Katz,* 533 U.S. 194, 200 (2001); *Aucoin v. Haney,* 306 F.3d 268, 272 (5th Cir. 2002). A court also considers whether the defendants' actions violated "clearly established statutory

27

or constitutional rights of which a reasonable person would have known." *Flores,* 381 F.3d at 395 (quoting *Hope v. Pelzer,* 536 U.S. 730, 739 (2002)).  If the law was clearly established at the time of the incident, the court must decide whether the defendant's conduct was objectively reasonable. *Aucoin,* 306 F.3d at 272.  Even if the government official's conduct violates a clearly established right, a defendant is entitled to qualified immunity if his conduct was objectively reasonable. *Hernandez ex. rel. Hernandez v. Tex. Dep't of Protective & Regulatory Servs.,* 380 F.3d 872, 879 (5th Cir. 2004).  Courts are free to consider whether the officers' conduct was objectively reasonable under clearly established law without first deciding whether the facts show a constitutional violation. *See Pearson v. Callahan,* ---U.S. ----, 129 S. Ct. 808, 818 (2009) ("On reconsidering the procedure required in *Saucier,* we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory.").

**B.      The Excessive Force Claim**

To prevail on an Eighth Amendment claim of excessive force, a plaintiff must establish "(1) an injury (2) which resulted directly and only from the use of force that was clearly excessive to the need and (3) the force used was objectively unreasonable." *Williams v. Bramer,* 180 F.3d 699, 703 (5th Cir. 1999).  A prison inmate alleging excessive force must show that the force used was malicious and sadistic, for the very purpose of causing harm rather than in a good-faith effort to maintain discipline. *Hudson v. McMillian,* 503 U.S. 1 (1992).

A court considers several factors in determining if there is a fact issue as to whether a use of force was unconstitutionally excessive.  These factors are: (1) the extent of the injury suffered; (2) the need for the application of force; (3) the relationship between the need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made

28

to temper the severity of a forceful response.  *Baldwin v. Stalder,* 137 F.3d 836, 839 (5th Cir. 1998);

*Hudson v. McMillian,* 962 F.2d 522, 523 (5th Cir. 1992).

### 1.    The First *Hudson* Factor

The first factor is the extent of the injuries suffered.  In *Brown v. Lippard,* 472 F.3d 384 (5th

Cir. 2006), the Fifth Circuit stated that in evaluating use of force claims, a court may look to the

seriousness of the injury to determine whether the use of force could plausibly have been thought

necessary or instead showed an unjustified infliction of harm.

In *Siglar v. Hightower,* 112 F.3d 191 (5th Cir. 1997), the Fifth Circuit considered whether

an inmate's injury, alleged to have resulted from excessive force, was too minor to raise a

constitutional issue.  The court described the officer's conduct and injury as follows: "[the

corrections officer] twisted Siglar's arm behind his back and twisted Siglar's ear.  Siglar's ear was

bruised and sore for three days but he did not seek or receive medical treatment for any physical

injury resulting from the incident.  There is no allegation that he sustained long term damage to his

ear."  *Id*. at 193.  The court concluded that because "Siglar's alleged injury – a sore, bruised ear

lasting for three days – was *de minimis*," he had not raised a valid claim for excessive force.  *Id.*

By contrast, in *Gomez v. Chandler*, 163 F.3d 921 (5th Cir. 1999), the court found a fact issue

as to whether the force applied was excessive.  The *Gomez* court observed that the force used against

Siglar was far briefer and less intense and less calculated to produce real physical harm than that

applied to Gomez.  Guards allegedly knocked Gomez down so that his head struck the concrete

floor, scraped his face against the floor, repeatedly punched him in the face, and kicked him in the

face and head.  Gomez allegedly suffered "cuts, scrapes, contusions to the face, head, and body."

On this record, the Fifth Circuit concluded that it could not say as a matter of law that Gomez's injuries were no more than *de minimis*. *Id*. at 924-25.

In the present case, Comeaux alleged that after he was violently thrown to the floor, officers continued to beat him. He claims that one officer pinned his head to the floor while another dragged him, causing his face to scrape the floor. Comeaux alleged that he sustained the following injuries: knots on his head; friction burns on the right side of the face; a stab wound on the left elbow; fractures to the left and right elbows; swollen knees; abrasions on neck, shins, knee, and arms; swollen wrist; neck and back pain; and bruises on his chest. In June 2002, Comeaux complained that his elbow was fractured, that bone fragments had exited the wound, and that it had been swollen for months.

The defendants argue that evidence produced immediately after the incident — the photographs of Comeaux and the testimony of the nurse — show only superficial abrasions. The injuries that were documented are too minor and fleeting to raise a fact issue as to an Eighth Amendment violation, according to the defendants, and make clear that no reasonable jury could find that the incident occurred as Comeaux alleged.

In the order dated September 28, 2006, this court found:

> Comeaux's affidavit sets out detailed allegations that officers stabbed him with scissors, causing cuts that bled profusely; beat him with fists, causing severe bruising; and dragged him on the floor, causing a burn on his face. In this respect, his claims are similar to the claims in *Gomez*. The difference is that in *Gomez*, the record included consistent medical documentation of the injuries, while in the present case, the only indication in the medical records of any injury after the February 11, 2002 use-of-force incident is two abrasions, which are clearly *de minimis*. The medical records in this case cover extended periods in 2002, but do not reflect any treatments for the injuries Comeaux asserts, including broken bones in his arms, "holes" in his arms that bled profusely, "missing" bones in his arms, or numerous

30

> scrapes, bruises, and burns.  The photographs taken after the event do
> not reflect any such injuries.

(Docket Entry No. 52, p. 23).  Comeaux does not identify or submit any evidence controverting the

medical records of the nature and extent of his injuries in the use of force incident.

The summary judgment evidence shows that Nurse McCartney was in her office off the

medical hallway where the incident took place.  (Docket Entry No. 90, Defendants' Motion for

Summary Judgment, Ex. E, McCartney Deposition, p. 38).  Nurse McCartney testified that she heard

a commotion in the hallway.  When she came out of her office, she saw that officers had secured

Comeaux on the ground.  (*Id*. at 39).  Nurse McCartney examined Comeaux immediately after the

use-of-force incident.  She found a superficial abrasion, 4 inches by 1/4 inch, below the right knee.

She also saw a 1/4-inch round superficial abrasion on the left elbow.  In her deposition, Nurse

McCartney explained that the abrasion below the right knee was superficial, limited to the top layer

of skin.  (*Id*. at 49).  She explained that a cut would be deeper and considered less superficial

because it actually breaks the skin.  Nurse McCartney also noted the abrasion on Comeaux's left

elbow.  She determined that it was also superficial because it only affected the uppermost layers of

skin.  Nurse McCartney testified that Comeaux's abrasions were bleeding slightly but stopped

bleeding after she cleaned them.  Nurse McCartney testified that there was little blood and that no

blood was running down his leg.  (*Id*. at 51).  Nurse McCartney testified that she cleaned the leg and

elbow and applied a triple antibiotic ointment and band-aids.  (*Id*. at 51; Docket Entry No. 100,

Defendants' Supplemental Motion for Summary Judgment, Ex. A, pp. 2-7).

Sergeant Jenkins took several photographs of Comeaux and his injuries. (Docket Entry No.

100, Defendants' Supplemental Motion for Summary Judgment, Ex. A, pp. 4-7).  The summary

judgment evidence contains eight black and white photographs of Comeaux that were taken soon after the injury.  The photographs show the following:

(1)     A frontal view of Comeaux, seated in a wheelchair.  Comeaux is looking straight ahead.

(2)     A frontal view of Comeaux, seated in a wheelchair.  Comeaux is looking down and to the left at Nurse McCartney.

(3)     Comeaux's left elbow.  There appears to be a small amount of blood on the elbow.

(4)     Comeaux's left elbow.  An abrasion is shown on the elbow with a small amount of blood.

(5)     A frontal view of Comeaux's right leg.  Nurse McCartney is pointing at the abrasion on the upper portion of Comeaux's shin.  A small abrasion and blood are visible.

(6)     The same frontal view of Comeaux's right leg.  There is an abrasion on the upper portion of Comeaux's shin.  A small abrasion and blood are visible.

(7)     A frontal view of Comeaux seated in his wheelchair.  Comeaux is looking to his left.  The vertical abrasion on his right shin is visible.

(8)     A frontal view of Comeaux seated in his wheelchair.  Comeaux is looking down.  The vertical abrasion on his right shin is visible.

(Docket Entry No. 100, Defendants' Supplemental Motion for Summary Judgment, Ex. A, pp. 4-7).

In this case, Comeaux claims injuries that are similar to those sustained by the inmate in *Gomez* – cuts, scrapes, friction burns to the face, bruises, and broken bones.  The medical records,

the nurse's testimony, and the photographs are wholly inconsistent with these claims.  They show scrapes.  But Comeaux's allegations and current law preclude the conclusion that this evidence of minor injury, far less than would result if the force were as severe as he claimed, means that his excessive force claim cannot proceed.  The evidence as to the extent of his injuries is not enough to conclude that as a matter of law they were constitutionally *de minimus*.  The Supreme Court has recently emphasized that the core judicial inquiry when a prisoner alleges excessive force is not whether a certain amount of injury resulted, but rather whether force was applied in a good-faith effort to maintain discipline or maliciously and sadistically, for the purpose of causing harm.  *Wilkins v. Gaddy,* --- U.S. ---, 130 S. Ct. 1175 (2010).  The extent of injury is, however, relevant to determining the amount of force applied and its purpose.

In this case, the degree of injury alone does not show that there is no constitutional claim.  Rather than focusing solely on the amount of injury, the important question is whether the force was applied in a good-faith effort to maintain discipline, or maliciously and sadistically for the very purpose of causing harm.  In remanding this case, the Fifth Circuit stated:

> With respect to Comeaux's excessive use of force claim, it is undisputed that Comeaux was injured as the result of a "major use of force" by certain defendants.  Because a genuine issue of material fact exists regarding the need and amount of force used by the defendants, the injuries could not be determined to be de minimus simply by evaluating the physical nature of the injury.  *See Williams v. Bramer,* 180 F.3d 699, 703-04 (5th Cir. 1999).  Accordingly, the district court erred in dismissing Comeaux's excessive use of force claim.  The district court's dismissal of Comeaux's failure to protect claim was
> based solely upon its conclusion that Comeaux had not suffered a "cognizable injury" in connection with his excessive force claim.  For the reasons noted, the district court did not properly determine whether Comeaux suffered a cognizable injury.  Accordingly, the district court's rulings on Comeaux's excessive use of force and

> failure to protect claims are vacated, and the case is remanded for
> further proceedings in connection with those claims.

(Docket Entry No. 66).

In *Barnes v. Johnson,* 204 F. App'x 377, 2006 WL 3102343 (5th Cir. 2006), the Fifth Circuit

explained the proper analysis, as follows.

> Barnes's allegations of severe injury directly contradict the
> defendants' summary-judgment affidavits stating that Barnes
> sustained only a bruise to the inside of his lip.  Even if the medical
> records show that Barnes could prove only that he suffered a bruised
> lip, this is not a per se de minimis injury.  The district court did not
> evaluate this injury in light of the remaining *Hudson* factors, *i.e.,*
> need for the application of force, relationship between the need and
> use of force, threat perceived by the official, and efforts made to
> temper the severity of the response.  *See Hudson,* 503 U.S. at 6-7,
> 112 S. Ct. 995. Without this inquiry and analysis of the allegations in
> light of the *Hudson* factors, it cannot be said that the force used by
> Slater was de minimis or that the injury suffered by Barnes was de
> minimis.  *See id.* at 7, 112 S. Ct. 995; *see also Williams v. Bramer,*
> 180 F.3d 699, 703-04 (5th Cir. 1999).  Accordingly, the summary
> judgment in favor of Slater is VACATED and this case is
> REMANDED for further proceedings.

*Barnes,* 2006 WL 3102343, at *1.

In light of the remand order and *Barnes,* this court now considers the remaining *Hudson*

factors.  The issue is whether, based on the expanded summary judgment record, there is still a

dispute under the *Hudson* factors as to the need and amount of force used by the defendants.

## 2.    The Second *Hudson* Factor

The second *Hudson* factor analyzes the need for force.  Major McComb testified that TDCJ

policy requires that all inmates who are being transported out of the unit must first change their

clothes.  The inmate will also be subjected to a strip search.  (Docket Entry No. 90, Defendants'

Motion for Summary Judgment, Ex. E, McComb Deposition,  pp. 30-32).  The requirements are to

ensure that the inmate is not carrying contraband.  Sergeant Sutton also testified that every inmate

that leaves the prison for a court setting must change his clothes.

Sergeant Sutton testified that on February 11, 2002, he went to Comeaux's cell to prepare

him to be transported for a court appearance in Fort Bend County relating to Comeaux having

stabbed his wife.  (Docket Entry No. 90, Defendants' Motion for Summary Judgment, Ex. E, Sutton

Deposition, p. 30).  Sutton placed Comeaux in hand restraints and took him in his wheelchair on the

elevator to the second floor observation cell, where he normally showered.  (*Id.* at 31-32).  While

in the second floor hallway, Sutton, Jenkins, and Biscamp offered Comeaux the opportunity to

shower before changing his clothes for court.  (*Id.* at 33).  At first, Comeaux was compliant and said

that he would take a shower and change clothes.  (*Id.*).  The officers testified that Comeaux then

refused to shower or change clothes.  (Docket Entry No. 90, Defendants' Motion for Summary

Judgment, Ex. E, Biscamp Deposition, p. 21).  Comeaux acknowledged that he refused to shower

or change; he told the officers he wanted the judge to see how he was treated.  When Comeaux

refused to cooperate in taking off his clothes, Major McComb ordered Biscamp to cut off the

clothes.  When Biscamp started to cut the clothing off, Comeaux started thrashing around and trying

to jerk away from the officers.  (Sutton Deposition, p. 42).  Biscamp described Comeaux's motions

as follows: "Just rolling his upper body.  His arms came up.  Elbows came out.  Arms – his hands

and arms began flailing around."  (Biscamp Deposition, p. 29).  At that point, Sutton and Jenkins

picked Comeaux out of his wheelchair and put him on the ground.  (*Id.* at 29).  Sutton testified that

no one "landed on top" of Comeaux.  (Sutton Deposition, p. 43).  As discussed above, Comeaux had

no physical injuries consistent with two officers landing on him, as he asserted.  Once Comeaux was

on the ground, the officers called for the video camera and additional staff, (*id.* at 43-44), and removed his clothes despite his lack of cooperation.  (*Id.*).

Captain Hutchison testified that in the course of making their rounds on the cell blocks, he and Major McComb observed Comeaux in the hallway.  (Docket Entry No. 90, Defendants' Motion for Summary Judgment, Ex. E, Hutchison Deposition, p. 11).  Captain Hutchison testified that Comeaux appeared to be complying until Biscamp started removing his clothes.  Comeaux then started resisting and pulling away from Biscamp, (*id.* at 16).  After Biscamp started cutting his uniform, Comeaux began swinging his arms back and forth.  Comeaux was wearing hand restraints that could be used as a weapon.  Comeaux was swinging his arms to try to get the officers away from him.  (*Id.* at 21).

The evidence shows a reasonable basis for the officers to use some force to secure Comeaux on the floor.  Comeaux refused to take a shower and change his clothes in preparation for his court date.  By resisting the officers' efforts to remove his clothes, Comeaux delayed the transport.  As events progressed, his swinging arms exposed officers to harm because of the mechanical restraints. Comeaux denies that he swung his arms or physically resisted the officers when they tried to remove his clothing after he refused.  But his version of the events is inconsistent with the photographs and medical evidence of his injuries and his version of the events after he was taken to the floor is directly contradicted by the videotape.  The inconsistencies between the contemporaneous medical evidence and the videotape on the one hand, and Comeaux's testimony on the other, are similar to the facts in *Scott v. Harris,* 550 U.S. 372 (2007).  The plaintiff's version of events in *Scott* was contradicted by a videotape of the relevant events. *See* 550 U.S. at 380-81.  The Supreme Court held that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the

36

record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380.

Comeaux's version of the events is also wholly inconsistent with the contemporaneous photographs of his injuries – two superficial scrapes – and the medical evidence about those injuries. The second *Hudson* factor weighs in favor of the defendants.

### 3.    The Third *Hudson* Factor

The third *Hudson* factor involves the relationship between the need for and the amount of force used.  The summary judgment evidence shows that on February 11, 2002, Biscamp was on the second floor and saw Comeaux as he was wheeled out of the elevator.  (Docket Entry No. 90, Defendants' Motion for Summary Judgment, Ex. E, Biscamp's Deposition, p. 17).  Biscamp was there to supervise Comeaux's shower and preparation for court.  (*Id*. at 19).  Comeaux first appeared willing to cooperate with the orders to change his clothes and shower, then refused.  (*Id*. at 23). Biscamp was standing on Comeaux's left side, slightly behind his wheelchair.  (*Id*. at 26).  When Biscamp touched Comeaux's sleeve to begin cutting his shirt off, Comeaux became very physical. (*Id*. at 25).  Sergeants Sutton and Jenkins were standing in front of Comeaux on either side of the wheelchair.  (*Id*. at 26).  Once Comeaux began flailing his arms, Sutton and Jenkins removed Comeaux from his chair and placed him on the floor.  (*Id*. at 29).  As soon as he was on the floor, Comeaux stopped resisting.  (*Id*. at 30).  Biscamp then removed Comeaux's clothing with the scissors.  (*Id*. at 30).

Nurse McCartney testified that TDCJ-CID policy requires medical personnel to keep all sharp objects locked up and accounted for.  An officer needing scissors would have to go to a nurse and ask for a pair of medical scissors.  (Docket Entry No. 90, Defendants' Motion for Summary

Judgment, Ex. E, McCartney Deposition, p. 41).  Nurse McCartney testified that medical or trauma scissors have a blunt end and are designed not to cut the skin.  (*Id*. at 41-42).

Jenkins testified that he met Sutton on the second floor because they planned to take Comeaux to the isolation cell to allow him to take a shower before he changed his clothes.  (Docket Entry No. 90, Defendants' Motion for Summary Judgment, Ex. E, Jenkins Deposition, p. 23).  As soon as Biscamp began cutting the sleeve of Comeaux's shirt, Comeaux began to jerk and thrash, preventing Biscamp from cutting the clothes.  (*Id*. at 26-27).  The officers ordered Comeaux to stop thrashing, and Biscamp tried once more to cut the shirt so it could be taken off.  (*Id*. at 27).  Again, Comeaux began thrashing violently.  (*Id*.).  The officers ordered Comeaux to stop resisting and allow them to remove his clothes.  Jenkins and Sutton placed their hands on Comeaux's chest, lifted him out of the wheelchair, and pulled him down to the floor.  (*Id.*).  No one fell heavily or jumped on top of Comeaux.  (*Id*. at 28).  Once Comeaux was on the ground, Jenkins assisted Biscamp and Sutton in taking off the hand restraints and removing Comeaux's clothes.  (*Id*. at 29).  Once Comeaux was undressed, the officers performed a strip search and redressed him.  (*Id*. at 29).

Major McComb testified that he did not see anyone punch, slap, or kick Comeaux.  He witnessed the officers giving Comeaux several opportunities to comply with the order to remove his clothes. (Docket Entry No. 90, Defendants' Motion for Summary Judgment, Ex. E, McComb Deposition, p. 41).  It was not until Comeaux thrashed around to resist efforts to remove his clothing that Sergeants Jenkins and Sutton held him down while Lieutenant Biscamp cut the clothes off.  Sutton and Jenkins were the only two people physically holding Comeaux to the ground.  (*Id*. at 33).  They were on their knees; Sutton held Comeaux's upper body while Jenkins held the lower portion.

(*Id*. at 34).  The time from which Lieutenant Biscamp began cutting Comeaux's shirt, triggering his resistance, to when Sutton and Jenkins took Comeaux to the floor was about ten seconds.  (*Id*. at 42).

Captain Hutchison testified that when he came on the scene, Comeaux appeared to be complying with orders.  Hutchison testified that Sergeants Sutton and Jenkins each grabbed Comeaux by the shoulder, pulled him out of his chair, and set him on the floor.  (Docket Entry No. 90, Defendants' Motion for Summary Judgment, Ex. E, Hutchison Deposition, p. 31).  Sutton and Jenkins did not and could not put Comeaux on the floor gently because he "was resisting and throwing his arms around."  (*Id*. at 31-32).

The defendants responded to the threat posed by Comeaux's physical resistance by removing him from the wheelchair and placing him on the floor.  Though Comeaux's hands were in mechanical restraints, he was jerking, thrashing, and swinging his arms violently.  The officers determined that the most efficient way to minimize the threat was to place Comeaux on the ground on his stomach.  By pinning Comeaux's arms under his body, he could no longer use them to swing the heavy restraints toward the officers.  Based on this evidence, the application of force was not clearly excessive to the need to restore discipline and maintain order.  *Hudson,* 503 U.S. at 6-7.

Comeaux's testimony describes himself as physically passive in his refusal to shower or change and his objection to efforts to cut off his shirt.   As noted above, however, his testimony about what occurred is wholly inconsistent with the contemporaneous photographs and other evidence of the injuries he received.  And his testimony about what occurred once he was on the floor is wholly inconsistent with the contemporaneous videotape.  The third *Hudson* factor weighs in favor of the defendants.

### 4.      The Fourth *Hudson* Factor

The fourth *Hudson* factor concerns the threat reasonably perceived by the responsible officials.  The evidence shows that the defendants reasonably perceived that Comeaux posed a threat to institutional safety and discipline.

Sergeant Sutton testified that the officers on the scene reasonably believed that Comeaux was a very aggressive inmate.  Sutton explained that Comeaux was in administrative segregation because he had stabbed his wife and others at his previous unit.  (Docket Entry No. 90, Defendants' Motion for Summary Judgment, Ex. E, Sutton Deposition, p. 26).  Lieutenant Biscamp testified that the officers knew about the violence that led to Comeaux's transfer to that unit.  (Biscamp Deposition, p. 14).  Biscamp testified that he knew that Comeaux had a "tendency to go off," or not comply with orders.  (*Id*. at 15).

Captain Hutchison testified that he and fellow officers closely supervised Comeaux because they knew he had a security precaution designation.  (Hutchison Deposition, p. 10).  Comeaux had stabbed his wife during a visitation period at his prior institution, then stabbed another visitor who, with other staff, tried to help the wife.  (*Id*. at 58).  When Comeaux committed these acts, he was in a wheelchair, just as he was in February 2002.  (*Id*. at 58).  Captain Hutchison explained that a security precaution designator "is a code that we put on our offenders who have had a serious assault within the past ten years.  It's a magnetic sticker that we put on their cell door so that everybody involved knows of his tendencies or that he has a history of assaulting staff."  (*Id*. at 10).  The precaution designator on Comeaux's door tells officers "every day that we go there, that he is staff assaultive.  It's not a secret.  It's posted on the door as a reminder for us to watch this guy."  (*Id*.)  Captain Hutchison testified that he believed that Comeaux was dangerous.  (*Id*. at 10).  Based on his

history, the officers considered Comeaux as a high-risk inmate with a history of violent assault, including on prison staff. (*Id.*).

Captain Hutchison testified that on the morning in question, he interpreted Comeaux's movements as a potential assault. (*Id.* at 44). "I know that he stabbed a captain in the past. That little sticky is on his door. All my staff know it. And he was jerking around. And I believe that my – my staff members felt threatened. And I believe they secured him to the floor." (*Id.* at 48). Captain Hutchison testified that a video camera was not immediately ordered because the use of force against Comeaux was a spontaneous incident. (*Id.* at 52).

When Major McComb arrived, Lieutenant Biscamp was explaining to Comeaux the need to remove his prison clothes. (Docket Entry No. 90, Defendants' Motion for Summary Judgment, Ex. E, McComb Deposition, p. 13). Comeaux told Biscamp that he was, "paraplegic, paralyzed, what have you. Some medical diagnosis that Comeaux was trying to tell Biscamp." Major McComb instructed the officers to remove Comeaux's clothes. As the officers were preparing to do so, Comeaux began complaining about his ranges of motion. At that point, Major McComb ordered Lieutenant Biscamp to cut off Comeaux's clothes. (*Id.*). Captain Hutchison explained that an inmate's uniform will be cut off in situations when the officers do not want to take the hand restraints off the offender and leave themselves exposed to assault. (Docket Entry No. 90, Defendants' Motion for Summary Judgment, Ex. E, Hutchison Deposition, p. 22).

Lieutenant Biscamp went to Nurse McCartney and obtained a pair of medical scissors, which are rounded and cannot be used to stab. Comeaux said that he wanted to wear the clothes he was already wearing to court because he wanted them to see the condition he was in. (Docket Entry No. 90, Defendants' Motion for Summary Judgment, Ex. E, McComb Deposition, p. 13). As Lieutenant

41

Biscamp prepared to cut the sleeve, Comeaux became upset because he was wearing a T-shirt that he bought himself and he did not want it cut off.  Comeaux said "no" and started thrashing in the chair to avoid Biscamp.  (*Id*. at 14).  Sergeants Sutton and Jenkins tried to secure Comeaux in his wheelchair.  (*Id*. at 14-15).  Comeaux resisted.  At that point, Sutton and Jenkins went to the front of Comeaux's wheelchair and pulled him out, toward them.  They all fell on the floor, and Comeaux partially landed on Sutton and Jenkins.  (*Id*. at 15).  They used their hands to hold Comeaux and prevent him from moving on the floor.  (*Id*. at 15-16).  Biscamp was still standing behind Comeaux's wheelchair.

Because a use of force incident had taken place, Major McComb ordered a video camera to the scene.  Officer Monjaras brought it within one minute.  Sutton and Jenkins maintained control over Comeaux on the floor until the camera arrived.  (*Id*. at 16).  Once the camera arrived, Lieutenant Biscamp began cutting Comeaux's clothing.  (*Id*. at 17).

Major McComb realized that some use of force would be necessary when Comeaux began thrashing in his wheelchair.  (*Id*. at 25).  He explained that he did not immediately call for a video camera because it was more important first to make sure that Comeaux was not a threat to himself or anyone else.  Comeaux was taken to the floor because he was thrashing around and swinging his arms, resisting Biscamp's efforts to cut off the clothes.

Comeaux asserts that given his disabilities, it was not reasonable to view him as a threat that required any force to subdue.  But the summary judgment evidence shows that the defendants reasonably perceived that Comeaux posed a threat to institutional safety in part because they suspected that he was only pretending to be paralyzed.  Major McComb explained that he did not anticipate the need for a video camera in part because Comeaux "likes to maintain that he's

42

paralyzed.  To maintain his perception of being paralyzed, he's usually going to act the victim.  So

therefore, I would not expect him to act out and thrash around."  (*Id*. at 27).

> I say, I was completely surprised when he started thrashing around.
> Because that's unlike him because he likes to play paralysis.  He likes
> to give the appearance of total helplessness.  And that doesn't help
> his situation too much.  I mean, it was like, wow, he's going to jerk
> around.

(*Id*. at 41-42).

In support of their argument that they reasonably believed that Comeaux was malingering,

the defendants offer the affidavit of Dr. Kokila Naik, a physician who treated him.  In her affidavit

dated October 26, 2007, Dr. Naik testified as follows:

> I am currently the Medical Director of Rehabilitation Services for
> UTMB-CMC and have been employed with the University of Texas
> Medical Branch in correctional medicine for eighteen years.  I have
> been asked by the Office of the Attorney General to make this
> affidavit for the case styled *Comeaux v. Thaler, et al.,* Civil Action
> No. H-01-1411, in the United States District Court for the Southern
> District of Texas, Houston Division.  I am receiving no additional
> compensation for making this affidavit.

> I have reviewed Comeaux's medical records.  In addition, I have
> personal knowledge of this offender's medical condition because I
> have personally evaluated him on several occasions.  Offender
> Comeaux has been previously diagnosed with a stroke prior to his
> arrival at the Jester III Unit and the Estelle Unit.  While a stroke can
> be debilitating for a patient, a stroke is not a degenerative condition.
> To put it another way, the condition of patients who have had a stroke
> does not worsen as time passes, but may improve with time and they
> may regain functions that were lost by the stroke.  As such, part of
> the accepted course of treatment for a patient who has had a stroke is
> physical therapy and occupational therapy to improve their condition.
> A patient would have to suffer an additional stroke for his condition
> to worsen, and there is nothing to suggest that Offender Comeaux has
> suffered from an additional stroke.

> Offender Comeaux is classified as independent wheelchair status,
> which simply means that while he is in a wheelchair, he is able to

take care of his basic needs such as manipulating his wheelchair, brushing his teeth, eating, and other such tasks.  He is housed in the high security administrative segregation wing of the Estelle Unit because of his history of assaultive behavior.  He is specifically assigned to an independent wheelchair administrative segregation cell, which is completely wheelchair accessible.

While Comeaux alleges that he is not able to care for himself in tasks as simple as eating and moving, that is not the case.  If a patient needed help in simple tasks or was "dependent," then certain effects would be noticeable in the patient's range of motion, skin condition, weight, and cleanliness.  Comeaux has not demonstrated any signs that he is unable to take care of himself.  Examinations of the patient, as well as reviews of video tapes recorded for the purpose of aiding in diagnosis, reveal that Comeaux has a fractional range of motion, is able to take care of himself, and can even stand at will.

It is my professional medical opinion that Offender Comeaux does not possess a physical impairment that substantially limits any of his major life activities, despite the fact that he insists he needs assistance caring for himself. . . .

(Docket Entry No. 90, Defendants' Motion for Summary Judgment, Ex. D, pp. 1-3).

In her affidavit dated May 21, 2010, Dr. Naik testified as follows:

I have reviewed Arcade Comeaux's medical records and I have also personally evaluated him in the past.  In addition to that, in December of 2003 I had the opportunity to view a video regarding his activities in his cell.  And very recently in December of 2009 I have had the opportunity to view several news programs on TV regarding when he was captured following his escape.  Based on all my information from the various above-mentioned sources and using my medical judgment, I have formulated the following opinion.

It is my opinion, based on a reasonable degree of medical probability, that Arcade Comeaux can currently walk without assistance.  It is also my opinion, based on a reasonable degree of medical probability, that all of this patient's functional capacities which he showed in 2003 and on November 30, 2009 when he escaped, were present in the beginning of his incarceration period in 1998, including in February 2002.

44

These opinions are based in part on the fact that this patient walked away from the TDCJ wheelchair van, leaving his wheelchair behind when he escaped on November 30, 2009.  He was without this wheelchair for a full week and obviously survived without it until his capture.  News videos show him walking without assistive devices when he was captured.   In addition, while this patient has a documented history of stroke, possibly two of them occurring before he entered TDCJ  which left him with some left-sided weakness, in all the information that is available to me, there has not been any objectively documented stroke since he entered the prison system in 1998.

Consequently, it is my opinion that all of his paresis (or weakness) happened with the original pre-TDCJ strokes.  Typically, the greatest improvement in a stroke patient will occur within 6-12 months following the stroke.   Given the escape, this patient's stroke obviously did not cause enough brain damage to permanently interfere with his ability to walk and strokes are not degenerative conditions which cause deficits to deteriorate over time.  Therefore, whatever capabilities he possesses today were present within 6-12 months following his last stroke, which according to his medical records, occurred before he entered TDCJ in 1998.

Finally, over the period of years since I have known him as a patient, Arcade Comeaux has been seen by me with abilities to stand, walk to short distance, and use both hands – but these abilities were never shown to me in a formal evaluation when he had control over what he would show. While I always *suspected* he was capable of doing a lot more than what he showed during formal evaluations, maybe even capable of functional walking, my suspicions became very much a doubtless knowledge with the TV news casts.

I declare that I am not receiving any additional compensation for my participation in this case other than my usual salary.

(Docket Entry No. 133).

In further support of their argument that Comeaux was feigning paralysis, the defendants offer a copy of the federal court's March 2008 opinion in Civil Action Number 4:01-1411.  In that case, Comeaux sued Warden Thaler and others at the Estelle High Security Unit, complaining that he was denied proper medical care and that the accommodations for his disabilities were inadequate.

Comeaux alleged that he needed substantial assistance with life's daily activities because he was unable to brush his teeth, pick up a food tray, dress, shower, or transfer himself from his wheelchair to his bed, the shower chair, or the toilet. Comeaux insisted that his cell was inadequate because its shower, sink, and toilet were not accessible to him.  When he first arrived at the Estelle High Security Unit on August 23, 1999, Comeaux claimed that he was left in his cell, sitting in his wheelchair, for fourteen days without any help from TDCJ employees to transfer to his bed.  He claimed that, during this same time period, he was denied food because he was unable to "retrieve his tray from [the] food slot" and that nursing staff refused to change his diaper.  Comeaux alleged that he was left in a filthy cell, sitting in his own waste, from August 23, 1999 through September 9, 1999, with no food, no clean water, and no change of clothing.  Comeaux complained that he was denied medical care on August 30, 1999, because his "disability prevented him from being handcuff[ed]" for a visit to the clinic.  Comeaux contended that, because he was denied access to handicap accessible accommodations for approximately fourteen days, he suffered a "feces rash burn front to back in [the] groin and buttock area," pain, loss of weight, swelling, loss of circulation in his legs, dizziness, unconsciousness, and fear.  Comeaux insisted that the Estelle High Security Unit was not capable of meeting his needs because it did not have features to accommodate his disability, lacked adequately trained medical and security staff to meet his needs as a handicapped inmate, and lacked adequate policies for meeting those needs.  In granting the defendants' summary judgment motion, the federal court stated in part as follows:

> The defendants maintain that Comeaux's conditions of confinement are fully compliant with the ADA . . . In support, the defendants provide an affidavit from Tom Hunt, who is an Assistant Warden at the Estelle High Security Unit.  (Docket Entry No. 89, Exhibit B).  Warden Hunt notes that the Estelle Unit is equipped with twenty wheelchair cells in administrative segregation.  (*Id.*).  These cells are

reserved for wheelchair-bound inmates and are equipped with wider doors and other accommodations for this type of individual inmate. (*Id.*).  Warden Hunt clarifies that "wheelchair inmates are subject to the same policies and procedures as non-wheelchair inmates" confined to administrative segregation in order to "ensure security and safety."  (*Id.*)

. . . .

Warden Hunt reports that the administrative segregation cells for wheelchair-bound inmates are "wheelchair accessible and are equipped with showers inside the cells, so that offenders can take a shower and clean themselves during the prescribed shower time." (*Id.*).   Each shower area reportedly has a stainless steel bench surrounded by support rails and a shower head that is lowered in order to accommodate inmates who are confined to a wheelchair. (*Id.*).  All cells are equipped with a toilet, a push-button sink, bed, mattress, and linens.  (*Id.*).  Warden Hunt reports that he is not aware of any inmate, including Comeaux, who has a disability that prevents him from operating the sink or the shower.  (*Id.*). Although the cells do not have a "call button", Warden Hunt reports that all of the wheelchair accessible cells are "directly adjacent to the officer's desk so that if they are in need of anything, the officer can hear the offender's request."  (*Id.*).

With regard to meals, Warden Hunt explains that all administrative segregation inmates receive their meals in the same manner.  (*Id.*). At meal time, an officer will open the food tray slot and slide the offender's food tray to him.  (*Id.*).  The offender will take the food tray and the slot will be closed.  (*Id.*).  This procedure prevents inmates from throwing the trays at the officers.  (*Id.*).  According to Warden Hunt, all of the wheelchair-bound inmates at the Estelle Unit are capable of taking their food tray and feeding themselves.  (*Id.*). Warden Hunt reports that he is not aware of any instance in which Comeaux has not been able to take his food tray or feed himself. (*Id.*).

Warden Hunt states that he has seen no evidence that Comeaux is unable to take care of his own needs or that the Estelle Unit is unable to care for him.  (*Id.*).  Warden Hunt notes that, while Comeaux insists on using diapers, he cleans himself and changes his own diapers.  (*Id.*).  The diapers are then removed from Comeaux's cell on a regular schedule by inmates designated as orderlies (having Support Service Inmate or "SSI" status) or who are considered trustees.  (*Id.*). These inmates also clean Comeaux's cell, with officers' supervision,

47

to ensure that none of Comeaux's property is tampered with.  (*Id.*). . .

Moreover, the defendants contend that Comeaux is not disabled within the meaning of the ADA. Under the ADA, a "disability" means, with respect to an individual, "a physical or mental impairment that substantially limits one or more of the major life activities of such individual."  42 U.S.C. § 12102(2)(A).  The defendants present an affidavit from Dr. Niak, who has reviewed Comeaux's medical records and has personally evaluated him on several occasions. (Docket Entry No. 89, Exhibit A).  Dr. Niak explains that Comeaux apparently suffered a stroke prior to his arrival at the Jester III Unit and his assignment to the Estelle Unit. (*Id.*). While a stroke can be debilitating, it is not a "degenerative condition," meaning that the condition of patients who have had a stroke does not worsen as time passes, but may improve with time and they may regain functions that were lost through physical and occupational therapy.  (*Id.*).  A patient would have to suffer an additional stroke for his condition to worsen, and there is nothing to suggest that Comeaux has suffered an additional stroke.  (*Id.*).

Dr. Niak notes that Comeaux is classified as having "independent wheelchair" status, which means that "while he is in a wheelchair, he is able to take care of his basic needs such as manipulating his wheelchair, brushing his teeth, eating, and other such tasks."  (*Id.*). He is housed in the high security administrative segregation wing of the Estelle Unit because of his assaultive behavior.  (*Id.*).  He is specifically assigned to an independent wheelchair administrative segregation cell, which is completely wheelchair accessible.  (*Id.*).

Dr. Niak refutes Comeaux's claim that he is not able to care for himself in tasks as simple as eating and moving.  (*Id.*).  According to Dr. Niak, if a patient needed help in performing simple tasks or was dependent, then certain effects would be noticeable in his range of motion, skin condition, weight, and cleanliness.  (*Id.*).  Comeaux, however, has not demonstrated any signs that he is unable to take care of himself.  (*Id.*).  Examinations of the patient, as well as reviews of videotapes recorded for the purpose of aiding in diagnosis, reveal that Comeaux has a functional range of motion, that he is able to take care of himself, and that he can even stand at will.  (*Id.*).  The videotapes, which are summarized further below, support Dr. Niak's assessment that Comeaux is able to care for himself independently and that he is not hindered significantly by a recognizable disability. (Docket Entry No. 91, Exhibits C and D).

The medical records, which are summarized in Civil Action No. H-00-3812, also support the assessment that Comeaux has been functional and capable of caring for himself during the entire period of time relevant to this lawsuit:

> The medical records indicate that Comeaux had an initial stroke in 1984, which allegedly left him "hemiplegic" or partially paralyzed on the left side of his body.  (Docket Entry No. 61, Ex. B, *Medical Record*, at 3).  A second stroke in 1996, affected his right side but was reportedly resolved without any residual paralysis or weakness on his right side.  (*See id.*).  According to Dr. Niak, Comeaux received a "full program" of physical therapy upon his return to prison in 1998.  (Docket Entry No. 61, Ex. B).  Comeaux's medical records reflect that he received PHOP rehabilitation counseling at the Jester III Unit from August of 1998, through June of 1999.  (Docket Entry No. 61, Ex. A, *Medical Records* at 51-57).

> Dr. Niak explains that, in late 1999, Comeaux was returned to the Jester III Unit and referred to PHOP for occupational therapy for his right upper extremities.  (*See id.*).  That therapy took place over 19 weeks between January and May of 2000.  (*See id.*).  Dr. Niak explains that Comeaux's therapy took 19 weeks to complete "to compensate for the sessions he missed due to security reasons."  (*Id.*).  The medical records reflect that, after he completed this regimen, he was discharged to return to the Estelle High Security Unit and to follow a home exercise program.  (Docket Entry No. 61, Ex. A, at 45).  That assessment found that Comeaux was "I" or independent in "ADL's" or activities of daily living. (*See id.*).

> Dr. Niak notes in her affidavit that, during an evaluation on December 29, 1999, Comeaux "stood and walked with a normal gait."  (Docket Entry No. 61, Ex. B).  Dr. Niak implies that Comeaux has exaggerated the extent of his paralysis or that he is malingering, noting that "[i]t requires no effort to not move a body part and then claim there is weakness and paralysis."  (*Id.*).  Comeaux denies that he is

49

malingering. However, additional evidence in the medical records supports Dr. Niak's observation and her conclusion that the physical therapy sought by Comeaux was not required.

On October 24, 2000, Comeaux was seen at the Jester III Unit in conjunction with PHOP. (*See* Docket Entry No. 66, Ex. A, *Medical Records*, at 19). Dr. Largent observed that Comeaux complained of "right sided weakness which has not been documented" and he was "observed doing normal activities." (*Id.*). According to Dr. Largent's review, Comeaux had been evaluated recently at the John Sealy Hospital in Galveston, where his right side "showed good strength." (*Id.*). Thus, at that time, there was "no current indication for therapy." (*Id.*).

The medical records further reflect that Dr. Niak and two other officials visited Comeaux at the Estelle Unit High Security facility on April 30, 2001, to address his complaints about his housing. (*See id.* at 23). It was noted that Comeaux's right extremities were functional even though he claimed they were not during his medical examinations. (*Id.*). It was further noted that an officer had observed Comeaux use both arms prior to the visit. (*Id.*). Likewise, staff at the Estelle Unit observed that Comeaux could get in and out of his wheelchair and into bed on his own. (*Id.*). During the visit, neither Comeaux nor his bed were found to be dirty or unclean. (*Id.*).

A physical therapy evaluation conducted on April 30, 2001, noted that Comeaux had been observed using his left and right upper extremities to drink from a cup and to handle his food. (*See id.* at 29). A physical therapist observed Comeaux "wheeling his wheelchair" back and forth in his cell. (*See id.*). After the physical therapist further observed "multiple heavy books" on Comeaux's bed, the therapist asked Comeaux to demonstrate how he was able to move those books and Comeaux successfully demonstrated that he was able to use his right arm to do "transfer activities." (*Id.*). As a result of these

50

observations, the therapist noted that no physical therapy was needed.  (*Id.*).

An examination conducted at the John Sealy Hospital on May 4, 2001, noted that Comeaux had "normal muscle tone of lower and upper extremity on [the] left side with no evidence of atrophy."  (*See id.* at 27).   Because multiple witnesses observed Comeaux use his left arm to eat, the doctor noted that Comeaux's complaints of "hemiplegia" or partial paralysis was probably "malingering."  (*Id.*).  A clinic note dated June 25, 2001, showed that a nurse observed that Comeaux showed "good mobility" in his right upper extremities.  (*See id.* at 29).

Civil Action No. H-00-3812, Docket Entry No. 70, at 8-12 (footnotes omitted).  As noted above, the Fifth Circuit has already rejected Comeaux's claim that his discharge from the PHOP at the Jester III Unit posed a violation of the Eighth Amendment.  *See Comeaux v. Mackwani, et al.,* No. 03-20776 (5th Cir. March 23, 2005), *cert. denied*, 546 U.S. 1103 (2006).  Comeaux did not refute that finding then and he cannot do so now. . . .

In addition to the medical records and the affidavits from Dr. Niak and Warden Hunt, the defendants present surveillance videotapes from 2003 and 2007, which show that Comeaux is functional and that he has not been denied adequate accommodations or the ability to care for himself.  (Docket Entry No. 91, Exhibits C and D).  The videotapes depict Comeaux in his cell, leafing through books and materials with dexterity.  The tapes show that he is able to move about in his cell with ease and that he has no difficulty negotiating the cell with his wheelchair by pushing off the floor with his feet or by using both hands.  Comeaux is able to reach under his bed, pick up items of all kinds, and organize materials on his bed.  The videotapes show that he has full range of motion in both arms. He is shown eating breakfast, drinking from a cup or carton, opening and closing a package or envelope without any problem.  The videotape from 2007 shows Comeaux writing diligently for hours at a time, with his feet propped up on the bed as he reaches around his cell to pick up various reference materials.  In both videotapes, he appears well nourished, groomed, alert, and in no distress.  More importantly, both videotapes show that Comeaux is able to rise from his chair and stand on his own as he arranges the cushions and blankets that line

his wheelchair.  (Exhibit C, 19:10-11, April 20, 2003; 03:15, April 21, 2003; Exhibit D, 09:45-48, April 20, 2007).

Dr. Niak emphasizes in her affidavit that, in her professional medical opinion, Comeaux does not possess a physical impairment that substantially limits any of his major life activities, despite the fact that he insists he needs assistance caring for himself.  (Docket Entry No. 89, Exhibit A). . . .

. . . The record in this case falls far short of the showing required to make a claim under the ADA.  In fact, the record illustrates that Comeaux's alleged disability is no more than a ruse.

The record contains no evidence that Comeaux has been denied adequate medical care and there is no showing that prison officials at the Estelle Unit have deliberately or intentionally discriminated against him regarding his disability-related needs. . . . Comeaux's allegations are refuted by the record set forth above in Civil Action No. H-00-3812, and the videotapes provided by the defendants in this case as well as the affidavits from Warden Hunt and Dr. Niak.  Likewise, Comeaux's contention that he was completely disabled in August 1999 is undercut completely by the undisputed fact that, in July of 1999, Comeaux had the physical capability to stab two people in the visitation room at the Jester III Unit.

Based on this record, Comeaux does not establish that he is disabled . . .

*Comeaux v. Thaler,* Civil Action Number 4:01-1411, 2008 WL 818341, **13-17 (S.D. Tex. 2008).

The defendants argue that when this court entered its prior ruling and the Fifth Circuit reviewed it on appeal, the evidence demonstrating the extent of Comeaux's malingering was not available.  (Docket Entry No. 90, Defendants' Motion for Summary Judgment, p. 14).  Comeaux responds that because the operative facts about the 2002 incident have not changed since the defendants first moved for summary judgment, the genuine issues of material fact that the Fifth Circuit found still exist.  (Docket Entry No. 94, p. 2).

Under the law of the case doctrine, "an issue of fact or law decided on appeal may not be reexamined either by the district court on remand or by the appellate court on a subsequent appeal." *United States v. Williams,* 517 F.3d 801, 806 (5th Cir. 2008) (citation omitted); *accord United States v. Cervantes-Blanco,* 504 F.3d 576, 587 (5th Cir. 2007); *United States v. Becerra,* 155 F.3d 740, 752 (5th Cir. 1998), *abrogated on other grounds as stated in United States v. Farias,* 481 F.3d 289, 292 (5th Cir. 2007). "This prohibition covers issues decided both expressly and by necessary implication, and reflects the jurisprudential policy that once an issue is litigated and decided, that should be the end of the matter." *United States v. Pineiro,* 470 F.3d 200, 205 (5th Cir. 2006) (citation and internal quotation marks omitted). The Fifth Circuit has recognized three exceptions to the law of the case doctrine. "[A] prior decision of this [C]ourt will be followed without reexamination . . . unless (I) the evidence on a subsequent trial was substantially different, (ii) controlling authority has since made a contrary decision of the law applicable to such issues, or (iii) the decision was clearly erroneous and would work a manifest injustice." *Williams,* 517 F.3d at 806-07 (citations omitted); *Becerra,* 155 F.3d at 752-53.

The evidence that has become available since the Fifth Circuit remanded this case included the record and holding in the federal court suit Comeaux filed against state prison officials alleging disability discrimination. On March 25, 2008, the federal district court granted the defendants' summary judgment and dismissed the case. After reviewing Comeaux's medical records and an affidavit of Dr. Naik, the court entered the findings and conclusions set out above, including that "Comeaux's alleged disability is no more than a ruse." *Comeaux v. Thaler,* Civil Action Number 4:01-1411, 2008 WL 818341 (S.D. Tex. 2008). The Fifth Circuit entered its remand order in the instant case three days later, on March 28, 2008. (Docket Entry No. 66).

The defendants argue that this case falls within an exception to the law of the case doctrine. (Docket Entry No. 126, p. 8).  The first exception to the law of the case doctrine applies because neither this court nor the Fifth Circuit could have considered the district court's finding or the underlying evidence that Comeaux's "disability is no more than a ruse."  That alone is sufficient to satisfy the first exception to the doctrine.  The consistent evidence relating to Comeaux's physical abilities demonstrated in the later escape from prison similarly could not have been considered by this court or the Fifth Circuit.  That evidence is relevant because the disability Comeaux claimed in 2002 that allegedly required him to need a wheelchair and severely limited his ability to move is static.  The evidence of his ability to walk and to live without any wheelchair or other aid for over a week in 2009 is evidence of his physical capabilities in 2002.  This evidence is another basis to invoke the first exception.  Because the current summary judgment record evidence is substantially different, the law of the case doctrine does not preclude either considering that evidence or reaching a different result based on the expanded summary judgment record.

The summary judgment evidence shows that the defendants were aware of Comeaux's history of aggression and violence, even while confined in a wheelchair.  That history included stabbing his wife and another visitor at his prior prison unit.  The defendants reasonably believed that Comeaux was faking the extent of his disabilities and in fact could move – and fight – much more than he pretended.  The reasonableness of that belief is confirmed by the medical evidence.  When Comeaux refused to comply with the shower and clothing change and when he physically resisted the effort to cut away his shirt with blunt-tipped medical scissors, the officers reasonably perceived his swinging arms (with the heavy metal restraints) to threaten their safety.  The fourth *Hudson* factor weighs in favor of defendants.

54

### 5.   The Fifth *Hudson* Factor

The fifth *Hudson* factor concerns the efforts made to temper the severity of a forceful response.  The summary judgment evidence shows that the defendants took steps to temper the severity of the response.

Major McComb explained that the cutting of the clothes was a minor use of force required when Comeaux did not cooperate in removing his clothes when the officers asked him to do so, verbally resisted, and began to thrash and jerk in his chair.  (Docket Entry No. 90, Defendants' Motion for Summary Judgment, Ex. E, McComb Deposition, p. 22).  McComb testified that when Comeaux was ordered to remove his clothes, there were only two ways to do so.  The officers would have to remove the handcuffs or cut off the clothing.  (*Id*. at 23).  If Comeaux had agreed to remove his clothes, the officers would have moved him to a different area, locked the door, and removed the handcuffs one at a time so he could take off his shirt.  Alternatively, if there was sufficient staff on hand and there was no likelihood of disorder, the officers could have taken the handcuffs off while they maintained control of Comeaux's wrists.  (*Id*. at 23).

Major McComb testified that the officers adhered to the guidelines that must be followed before using any force.  The first action is listening.  The officers listened to Comeaux before his clothes were cut off.  He refused to cooperate in removing his clothes.   Major McComb testified that he and Lieutenant Biscamp made efforts to calm Comeaux.  Major McComb told Comeaux that he would have to take his clothes off and that they could help him do so or they could cut the clothes off.  (*Id*. at 24).  Comeaux refused to cooperate.  Comeaux was taken to the floor because he thrashed around in his wheelchair when they began cutting off his shirt.  (*Id*. at 25).

The fifth *Hudson* factor weighs in favor of the defendants. Lieutenant Biscamp and others issued several orders for Comeaux to remove his clothes. Comeaux was in hand restraints and could not do so unassisted. He refused to cooperate in removing his clothes. When Lieutenant Biscamp began cutting them off, Comeaux began thrashing his arms and pulling away from staff. The defendants used force to take him to the floor and restrain him because they reasonably believed that Comeaux posed a threat to security and their own safety. The undisputed evidence in the record shows that, as a matter of law, the defendants used force in a good-faith effort to maintain discipline, not maliciously and sadistically for the purpose of causing harm.

### 6.    Applying the *Hudson* Factors

All the *Hudson* factors weigh in favor of granting the defendants' summary judgment motion on the absence of constitutionally excessive force. This is consistent with other Fifth Circuit cases involving similar facts, including the absence of any evidence of the physical injuries the plaintiff asserts, which would be expected with the force the plaintiff alleged.

This result of applying the *Hudson* factors, with the evidence of the extent of injury, is consistent with other cases considering the use of force in the prison context. In *Wilburn v. Shane*, 193 F.3d 517, 1999 WL 706141 (5th Cir. 1999), the Fifth Circuit found that based on the objective evidence of Wilburn's medical records, which showed no injuries consistent with his allegations of excessive force, Wilburn's claims could not proceed. The Fifth Circuit concluded that the district court properly granted the motion for summary judgment as to all defendants. In *Tillis v. Garcia,* 99 F.3d 1135, 1996 WL 595639 (5th Cir. 1996), the prisoner represented himself in a § 1983 excessive force lawsuit against two TDCJ correctional officers. The case was tried before a jury.

The court granted the defendants' motion for judgment as a matter of law at the close of the evidence, stating as follows:

> The only factual dispute therefore was whether [the defendant] used excessive force to injure or harm [the plaintiff] in a malicious or sadistic manner during the April 13 incident. [The plaintiff] testified that he received an unprovoked beating by officers in which [the defendant] participated.  He testified that [the defendant] fell with both of his knees on [the plaintiff's] face and that [the defendant's] attempts to hit [the plaintiff's] face against the concrete and knock his teeth out resulted in a gash to [the plaintiff's] head and a cracked tooth.

> [The plaintiff's] version of events was contradicted not only by several prison guards' testimony, but also by a doctor's testimony concerning the nature of [the plaintiff's] injuries.  The jury was allowed to view photos of [the plaintiff] taken immediately after the incident as well as pertinent video tape.  [The defendant] denied that he dropped down on his knees between [the plaintiff's] jaw area and his neck area.  All of the guards consistently testified that [the defendant's] involvement was limited to holding the prisoner's legs down while leg shackles were placed on him.  Moreover, Dr. Stark testified that the medical records for April 13 indicate that [the plaintiff] refused a physical examination but the nurse noted two small abrasions, one above the left eyebrow and one about the right cheek area.  He testified that if [the defendant] had "dropped his knees" on [the plaintiff's] back, neck, and back of head area and picked up [the plaintiff's] head and tried to slam it into the concrete, as [the plaintiff] testified, [he] would have suffered a tremendous amount of swelling about the face, lips and nose, and probably about the eye area.  Dr. Stark also testified that bruises about the neck and upper thoracic area would be observed.  There was, however, no indication in the medical records that [the plaintiff] suffered those types of injuries.  The abrasions observed on [the plaintiff] were consistent with his being quickly taken down and being placed on the ground.  [The plaintiff] did not wholly deny that he had engaged in verbal abuse of the officers and that he did threaten them after the April 13 incident.  He also admitted that he had flooded his toilet prior to the June 13 use of force incident.

> In reviewing a district court's grant of the motion for a judgment as a matter of law, this court considers all of the evidence and reasonable inferences in the light most favorable to the party opposed

to the motion. *Portis v. First Nat'l Bank of New Albany[,] Miss.,* 34 F.3d 325, 327 (5th Cir. 1994). If the facts and inferences point so strongly and overwhelmingly in favor of one party that reasonable jurors could not arrive at a contrary verdict, granting the motion is proper. *Id.* If, however, there is substantial evidence of such quality and weight that reasonable jurors, in the exercise of impartial judgment, might reach differing conclusions, the motion should be denied. *Id.*

When considering an excessive-force claim, "the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. 1, 7 (1992). [The plaintiff] conceded at least that he engaged in provocative conduct toward the officers on April 13. A video tape showed him threatening the officers after the use of force. [The plaintiff] admitted engaging in property destruction before the June 13 incident. In the face of these admissions, combined with the objective facts that he refused a medical examination, his actual injuries consisted of no more than two scrapes, and there was no medical evidence consistent with the more severe type of injury he said he received, the magistrate judge was entitled to grant judgment as a matter of law. No reasonable jury could have found that the officers applied force "maliciously and sadistically to cause harm." It is true that under the *Hudson* test, a jury question will often arise about the possible use of excessive force, but this is one of the cases in which, after full trial on the merits, no reasonable jury could have found for [the plaintiff].

*Tillis v. Garcia,* 99 F.3d 1135, 1996 WL 595639 (5th Cir. 1996).

In the present case, similar to *Tillis*, the plaintiff, Comeaux, refused to comply with an order to change clothes and stated that he wanted to go to court in the clothes he was wearing. He refused to cooperate as needed to remove his clothing. He resisted efforts to cut the clothing off which was required because of the handcuffs. As in *Tillis*, the abrasions Comeaux suffered are consistent with his being quickly taken down and placed on the ground, and wholly inconsistent with the degree of force he alleged. Applying the *Hudson* factors to grant summary judgment is consistent with Fifth Circuit precedent.

Comeaux has failed to raise a fact issue material to determining whether the use of force violated his constitutional rights.  The defendants' motion for summary judgment on this use-of-force claim is granted.

## V.      The Claim Based on Bystander Liability

Comeaux alleges that officers present in the second floor medical hallway failed to intervene and prevent other officers from using excessive force.  A prison guard has a duty to intervene and attempt to end an assault on an inmate.  *Buckner v. Hollins*, 983 F.2d 119, 122 (8th Cir. 1993); *see also Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995) (citing *Smith v. Dooley*, 591 F. Supp. 1157, 1169 (W.D. La. 1984), *aff'd*, 778 F.2d 788 (5th Cir. 1985)).  An officer may be liable under section 1983, under a theory of bystander liability, if he (1) knows that a fellow officer is violating an individual's constitutional rights, (2) has a reasonable opportunity to prevent harm, and (3) chooses not to act.  *Randall v. Prince George's Cnty., Md.*, 302 F.3d 188, 203-04 (4th Cir. 2002).  The rationale underlying the bystander liability theory is that a bystanding officer, by choosing not to intervene, functionally participates in the unconstitutional act of his fellow officer.  *Id.* at 204 n.24.

In this case, the summary judgment evidence shows that the alleged use of excessive force lasted a few seconds.  Even assuming that other officers witnessed the use of force against Comeaux, he has not raised a fact issue as to whether those officers had a reasonable opportunity to intervene, given the fleeting nature of the entire incident.  And because the record does not show that any officers in the medical hallway violated the Eighth Amendment by using excessive force, Comeaux's claims that officers failed to intervene in the alleged assault lack merit.  The defendants are entitled to judgment as a matter of law.

## VI.     Conclusion

The defendants' motion and supplemental motions for summary judgment, (Docket Entry Nos. 90, 100, 106, 133), are granted.  Final judgment is entered by separate order.

The remaining pending motions are resolved as follows:

- The defendants' Motion to Dismiss, (Docket Entry No. 87), is denied as moot.

- Comeaux's Opposed Motion to Strike Defendants' Second Supplemental Disclosure, (Docket Entry No. 103), Motion to Strike Defendants' Supplement to Motion for Summary Judgment, (Docket Entry No. 104), Motion to Strike Defendants' Second Supplement to Motion for Summary Judgment, (Docket Entry No. 109),  and Motion to Strike Defendants' Third Supplement to Motion for Summary Judgment, (Docket Entry No. 137), are denied.

- Comeaux's Motion for Leave to File a Supplemental Opposition to Defendants' Motion for Summary Judgment, (Docket Entry No. 146), is granted.

- To the extent not previously addressed at the hearing on April 1, 2010, Comeaux's Motion in Limine, (Docket Entry No. 110), and Defendants' Motion in Limine, (Docket Entry No. 113), are denied as moot.

- Comeaux's Motion to Reopen Discovery on a Limited Basis, (Docket Entry No. 128), is denied as moot.

- The defendants' Motion to Quash Subpoenas Duces Tecum, (Docket Entry No. 130), is denied as moot.

- Comeaux's Motion to Strike Defendants' Fourth and Amended Fourth Supplemental Disclosure, (Docket Entry No. 138), and Comeaux's Motion to Grant Docket Entry Nos. 137 and 138 as Unopposed, (Docket Entry No. 145), are denied as moot.

Any remaining pending motions are denied as moot.

       SIGNED on January 10, 2011, at Houston, Texas.

                                           Lee H. Rosenthal
                                 United States District Judge